UNITED STATES of America, Appellee,

v.

John C. KELLEY, Appellant.

No. 92–3269.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 10, 1993.

Decided Sept. 27, 1994.

As Amended Sept. 27, 1994.

Carol Elder Bruce, Washington, DC, argued the cause, for appellant. With her on the brief were Charles F.C. Ruff and Allan B. Moore, Washington, DC.

Merrick Garland, Washington, DC, argued the cause, for appellee. With him on the brief were J. Ramsey Johnson, John R. Fisher, Roy W. McLeese, III, and Mary–Patrice Brown, Washington, DC.

Before GINSBURG and RANDOLPH, Circuit Judges, and WILL, Senior District Judge.*

Opinion for the Court filed by Senior District Judge WILL.

WILL, Senior District Judge:

A jury convicted John C. Kelley on six counts charging conspiracy to commit bribery and to defraud the United States, in violation of 18 U.S.C. § 371; bribery, in violation of 18 U.S.C. § 201(b)(2)(A), (B), and

(C); conspiracy to obstruct justice, tamper with a witness, and make false statements, in violation of 18 U.S.C. § 371, and obstruction of justice, in violation of 18 U.S.C. §§ 1505 and 1512. Kelley's motion for acquittal, or, in the alternative, for a new trial, was denied by the district court and Kelley was sentenced to 43 months' imprisonment followed by three years' supervised release, and ordered to pay restitution in the amount of $92,000.00. Kelley appeals his convictions and sentence, as well as the denial of his motions for leave to take foreign depositions, for a trial continuance, and for a new trial or acquittal. We have jurisdiction under 28 U.S.C. § 1291 and affirm both the convictions and the sentence.

## I. BACKGROUND

From approximately January 1987 through August 1990, John C. Kelley was a public official of the United States Agency for International Development ("AID"), holding positions including that of Deputy Director of Information Resources Management ("IRM"). While an employee of AID, Kelley had official duties, responsibilities, and authority in connection with two large-scale AID computer projects: the Contract Information Management System project ("CIMS"), and the Supreme Electoral Tribunal project (the "Electoral Project").

At trial, the government presented evidence to show that Kelley, while overseeing CIMS and the Electoral Project, conspired to solicit kickbacks from contractors in the two projects, and then conspired to conceal his activities.

### A. *Conspiracy, Bribery, and the CIMS Project*

Count One of the indictment charged Kelley with conspiring with Edgardo Derbes, Basic Developments/Megasistemas, Alejandro Aguirre, and Jorge Figueroa to commit bribery; Count Two charged Kelley with the substantive crime of bribery itself. Both counts deal with Kelley's conduct in connec-

---

* Of the United States District Court for the Northern District of Illinois, sitting by designation pursuant to 28 U.S.C. § 294(d).

tion with the company Basic Developments/Megasistemas.

In 1988, AID began developing CIMS with the intention of enabling its Office of Procurement to track all private vendors and contractors doing business with the agency. Kelley was requested to oversee the CIMS project for AID. The creation of CIMS required the services of contractors skilled in the use of a specialized computer program called Professional Application Creation Environment ("PACE"). As manager of the project, Kelley searched for such contractors, and approached Pinkerton Computer Consultants, Inc. ("Pinkerton"), a supplier of other computer services to AID. Kelley suggested that if Pinkerton could not develop CIMS itself using PACE software, it could hire a competent subcontractor to do the work. Pinkerton did not have the in-house PACE expertise, and was unsuccessful in acquiring a new employee with the necessary expertise.

Because Pinkerton had been unsuccessful, Kelley recommended to Pinkerton three companies with PACE experience, including a small Guatemalan company called Basic Developments/Megasistemas ("Megasistemas"). After contacting Megasistemas owners Alejandro Aguirre and Jorge Figueroa, Pinkerton determined that Megasistemas was well-qualified to develop CIMS. Pinkerton officials met with Aguirre and Figueroa several times to discuss the project.

Aguirre and Figueroa also met with Kelley to discuss CIMS. Kelley suggested that Megasistemas submit a proposal to Pinkerton, and assisted Aguirre and Figueroa in its preparation. Aguirre testified[2] that Kelley told them to include in their proposal the cost of purchasing three copies of PACE software at a total cost of $72,000.00. He further testified that Kelley edited the first draft of their proposal, deleting the specific reference to the $72,000.00 purchase of PACE copies and substituting vague language suggesting that Megasistemas would purchase "the software needed to develop CIMS." In June 1988, Megasistemas was awarded the subcontract.

Kelley acknowledged having made the changes to the proposal, but testified that he deleted the reference to PACE because AID already had the requisite copies of PACE, and, in any event, always purchased its software through an established State Department contract. However, Aguirre stated that Kelley did not inform him until several months after their proposal was written that Megasistemas would not be required to purchase *any* copies of PACE. Kelley denied ever discussing the inclusion of the cost of PACE in the proposal.

When Kelley later informed Aguirre and Figueroa that they would not have to purchase any PACE copies after all, they inquired about the $72,000.00 allocation for PACE copies. According to Aguirre and Figueroa, Kelley stated that he personally was entitled to the surplus $72,000.00. They further testified that Kelley told them that, if they wanted to be paid for their work on CIMS, they would have to pay him as he instructed. At trial, Kelley denied ever having stated that Aguirre and Figueroa should pay him the surplus $72,000.00, and that Megasistemas would not be paid if they refused.

Aguirre and Figueroa testified that Kelley agreed to accept the money in installments, the first of which was for $32,000.00 minus transaction costs. Aguirre described in detail the plan devised by Kelley to facilitate this payment. According to Aguirre, Kelley instructed them to "hire" Kelley's longtime friend, Edgardo Derbes, to provide consulting services to Megasistemas on the CIMS project. Although Derbes never provided any services to Megasistemas, Kelley presented Aguirre and Figueroa with two invoices—one for $32,000.00 and one for $40,000.00—which purported to show that Megasistemas had consulted with Derbes on the project. Kelley denied seeing the invoices prior to his preparation for trial.

According to Aguirre and Figueroa, Kelley also instructed them to establish a Panamanian "shell" corporation called Juldessy, which

---

**2.** Both Aguirre and Figueroa testified under plea agreements, pursuant to which they entered pleas of guilty to the misdemeanor of unlawfully supplementing a government employee's income in violation of 18 U.S.C. § 209.

purported to be the consulting company with which Derbes was affiliated. Kelley instructed Aguirre and Figueroa to pay Juldessy rather than Derbes directly. Derbes, testifying pursuant to a plea agreement, claimed that Kelley told him to keep the money he received through Juldessy as a partial down payment on Kelley's upcoming purchase of Derbes' home on Sutton Place in Washington, D.C.

Kelley testified that Juldessy was a joint venture between Derbes and Megasistemas. He admitted that he had assisted Derbes in opening the Juldessy bank account, and in depositing a check for nearly $30,000.00 into the account. Kelley denied any agreement with Derbes that he would accept money on Kelley's behalf as part of the down payment on the Sutton Place house. Rather, he testified that Derbes had loaned him the down payment for the house.

In early 1989, Kelley approached Aguirre and Figueroa to demand the balance of the $72,000.00. He again agreed to accept the remaining balance in installments; this time there were to be two payments of $20,000.00 each. When Aguirre and Figueroa informed Kelley that they did not have the money, Kelley told them that he would authorize AID payments to them for work they had done on CIMS. Kelley testified that he in fact had no authority to approve payments on the CIMS project.

Aguirre and Figueroa agreed to make the first payment of $20,000.00. They testified that Kelley directed them to obtain several black market checks—that is, checks obtained by using foreign currency to purchase United States dollars from a foreign money broker—each for $5,000.00 or less, make them payable to Filberto Cavazos, and send the checks to Derbes. Cavazos was the boyfriend of Kelley's niece, Michelle Cruz. In July 1989, Kelley prevailed upon Cavazos to open a bank account in his (Cavazos') name, but which would be used exclusively by Kelley. After the account was opened, Cavazos turned over to Kelley all account documents, after first signing the seven blank starter checks.

Megasistemas received payments in June and July 1989 for actual work it performed on CIMS. In July 1989, Figueroa, following Kelley's instructions, obtained five black market checks and sent them to Derbes. The checks were deposited into the Cavazos account, and then Kelley turned the entire account over to Derbes, instructing him as to the seven starter checks signed by Cavazos. Kelley directed Derbes to make out one check to Cruz for use as a partial down payment on a condominium. Derbes made out a second check to an Oscar Pereira, which Kelley used to repay an outstanding loan to Pereira. Kelley told Derbes to use the remaining five blank checks as he wished (up to a certain amount), and that he should consider that money as an additional contribution towards the purchase of the Sutton Place home.

Kelley acknowledged his assistance in opening the Cavazos account, but testified that his initial intention was to hide proceeds of the sale of his former house from his temporarily estranged wife, Patricia Parera. He further testified that he did not actually use the account for this purpose and that the account received $20,000.00 sent by Megasistemas. However, Kelley swore that he never demanded that money, claiming instead that Derbes had.

In October 1989, Kelley demanded the remaining $20,000.00 from Megasistemas. He also discussed with Aguirre and Figueroa an upcoming AID project called "MIDAS," and suggested that they might receive this contract. Aguirre and Figueroa agreed to pay Kelley the balance. According to Aguirre, Kelley requested the money in black market checks made payable to the Charles Schwab brokerage firm. Figueroa delivered the checks to Kelley. Megasistemas was then awarded the preliminary MIDAS contract. According to Derbes, Kelley gave him the checks for deposit into his (Derbes') Charles Schwab account, again with the understanding that the money be used toward the down payment on the Sutton Place home.

At trial, Kelley denied having demanded this remaining $20,000.00. Rather, he testified that in October 1989 Figueroa asked him to deliver to Derbes an envelope containing the checks. Derbes later discussed the

Schwab checks with Kelley, and gave one to Kelley to pay for some upcoming surgery.

By November 1989, Aguirre and Figueroa believed that they had fulfilled their obligation to Kelley. But they testified that Kelley demanded an additional $10,000.00 because he had arranged for an early payment to Megasistemas for a portion of the CIMS work. Aguirre and Figueroa refused. At trial, Kelley denied this demand.

Aguirre and Figueroa also testified that in February 1990, Kelley informed them that his nephew in Argentina had been seriously injured and needed $10,000.00 for medical care. A Bethesda neurosurgeon, Dr. Polanco, corroborated the fact that Kelley had a nephew who had suffered paralysis in Argentina. When Aguirre refused to give him $10,000.00, Kelley asked instead for a $1,000.00 donation for Guillermina de Ferrari.

Kelley admitted that he had requested donations from Megasistemas for his nephew's treatment, but denied a specific request for $10,000.00. He also admitted requesting a $1,000.00 donation on behalf of de Ferrari and testified that he sought the donation to "help an Argentine woman raise funds for legal fees in connection with moving into the United States." [3]

### B. *Conspiracy, Bribery, and the Electoral Project*

Count Three charged Kelley with conspiring with Derbes and Informatica to commit bribery and to defraud the United States. Count Four charged Kelley with bribery itself. Both counts deal with Kelley's conduct in connection with the company Informatica Internacional. The Electoral Project was a system designed to computerize voter registration and ballot counting in Guatemala.

Derbes also testified that in 1987, he loaned Kelley and his wife Parera $20,460.00 to buy a house on W Street in Washington, D.C. Derbes understood that Kelley would repay the debt. In 1987, Kelley recommended Derbes for a position with Executive Resources Associates ("ERA"), which Derbes accepted. AID then entered into a primary contract with ERA to develop the computer program necessary for the Electoral Project.

Derbes testified that while employed by ERA, he submitted at Kelley's suggestion a subcontract proposal for the Electoral Project on behalf of Informatica Internacional ("Informatica"), a Costa Rican company in which he was a co-partner. Before submitting the proposal, he estimated that the work would cost approximately $19,000.00. But Kelley instructed Derbes to add $20,000.00 to the proposal to cancel Kelley's 1987 debt of $20,460.00 to Derbes.[4] Derbes agreed and ERA accepted the proposal. Kelley was charged with overseeing the Electoral Project for AID, and approving the payment of bills from ERA and its subcontractors. He approved payments to Informatica for a total of $40,425.00. Derbes received $20,425.00 personally, allegedly as repayment of the 1987 loan.

Kelley denied suggesting that Derbes double the amount of the Informatica proposal. He stated that although he and his wife had borrowed money from Derbes in 1987, he repaid that loan in June and August 1989. Kelley admitted that he assisted Derbes in preparing Informatica's proposal, but explained that he did so only because Derbes had never before prepared a subcontract proposal.

### C. *Obstruction of Justice*

Counts Five and Six charged that Kelley obstructed justice and conspired to obstruct justice when he learned that his activities were under investigation by the AID Inspector General. At trial, the government presented evidence to support allegations that Kelley, Derbes, and others entered into a plan to deceive investigators, falsify documents, and encourage others to support several false stories to conceal the kickbacks he had solicited.

---

**3.** De Ferrari received $1,000.00, but testified that the money was an advance payment for some translation work that Kelley had requested.

**4.** During cross-examination, however, Derbes indicated that the bills from Informatica accurately reflected work done by its consultants on the project.

In September 1990, the AID Inspector General's office approached Derbes as part of its investigation, and questioned him about his financial dealings with AID employees. Derbes lied to investigators, denying that he ever gave or loaned anything to any AID employee. Following the interview, Derbes and Kelley had several phone conversations, during which, Derbes testified, they discussed how to conceal their transactions. With regard to the $20,460.00 that Derbes had loaned to Kelley and Parera in 1987, they decided that Derbes would tell investigators that Kelley had paid Derbes back, with interest, by two checks in June and August 1989. They informed Parera of this story, but she refused to repeat the story.

According to Derbes, they also discussed how to explain the source of Kelley's down payment on the Sutton Place home, and decided that they would hide the fact that the down payment actually came from kickbacks from the Megasistemas subcontract by creating a false deed of trust. The false deed indicated that Derbes had loaned Kelley the down payment on the house, and that Kelley still owed Derbes that money. These discussions and preparation of the false deed began after Derbes had been interviewed by the Inspector General. Derbes agreed to show the false documents to investigators when they next interviewed him. They also discussed the Panamanian "shell" corporation, Juldessy, because although Derbes had received the $30,000.00 check to Juldessy, he knew nothing about the company. Derbes contacted Aguirre and Figueroa through their attorney to find out more about Juldessy. Aguirre and Figueroa then created a false consulting report, among other documents, to suggest that Derbes had done consulting work through Juldessy for Megasistemas. They sent the documents to Derbes, who discussed them with Kelley.

In April 1991, Derbes was again interviewed by the Inspector General's office. Derbes told the investigators the stories he had prepared with Kelley. However, shortly thereafter, Derbes retained counsel and decided to confess the truth to investigators.

Kelley testified that he did in fact borrow the down payment for the Sutton Place home from Derbes, but claimed that the deed of trust reflected the formalization of this loan agreement and was not a tool to throw off investigators. Moreover, he denied ever advising Derbes to do anything other than obtain counsel and tell the truth.

## II. DISCUSSION

Kelley raises three issues on appeal: (1) whether the district court abused its discretion in denying his motions for leave to take foreign depositions and for a trial continuance; (2) whether the district court erred in convicting him of obstruction of justice under 18 U.S.C. §§ 1505 and 1512, and in denying his motion for acquittal or a new trial; and (3) whether the district court inaccurately calculated his offense level under the federal sentencing guidelines.

### A. *Denial of Pretrial Motions*
#### 1. *Depositions*

 Unlike the practice in civil cases, where depositions may be taken as a matter of right without permission of the court, *see* Fed.R.Civ.P. 26(a) and 30, Rule 15(a) of the Federal Rules of Criminal Procedure permits depositions in criminal cases to be taken only by order of the court, and then only in "exceptional" situations:

> Whenever due to exceptional circumstances of the case it is in the interest of justice that the testimony of a prospective witness or a party be taken and preserved for use at trial, the court may upon motion of such party and notice to the parties order that testimony of such witness be taken by deposition.

Fed.R.Crim.P. 15(a). The purpose of Rule 15(a) is to preserve testimony for trial, not to "provide a method of pretrial discovery." *See United States v. Troutman*, 814 F.2d 1428, 1453 (10th Cir.1987). *See also United States v. Adcock*, 558 F.2d 397, 406 (8th Cir.), *cert. denied*, 434 U.S. 921, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977).

 Furthermore, the party seeking the deposition bears the burden of demonstrating that "exceptional circumstances" necessitate the preservation of testimony through a deposition. *United States v. Ismaili*, 828

F.2d 153, 159 (3d Cir.1987), *cert. denied,* 485 U.S. 935, 108 S.Ct. 1110, 99 L.Ed.2d 271 (1988). Critical factors toward meeting this burden include (1) the materiality of the testimony; and (2) the unavailability of the witness to testify at trial. *Id.* Moreover, there is typically some showing, beyond "unsubstantiated speculation," that the evidence exculpates the defendant. *See, e.g., Guam v. Ngirangas,* 806 F.2d 895, 897 (9th Cir.1986); *United States v. Wilson,* 601 F.2d 95, 97 (3d Cir.1979); *United States v. Ontiveros–Lucero,* 621 F.Supp. 1037, 1038 (W.D.Tex.1985), *aff'd,* 790 F.2d 891 (5th Cir.1986). We review the district court's denial of the motion to take depositions for an abuse of discretion. *Ismaili,* 828 F.2d at 158.

■ The district court did not abuse its discretion when it denied Kelley's motion to take the depositions of several potential government witnesses. Kelley sought to depose Aguirre, Figueroa, Cavazos, and the records custodians for Megasistemas and Informatica. Although Kelley did not definitely know if Aguirre and Figueroa would be called by the government to testify, defense counsel acknowledged that it would be a "highly unusual bribery case" if it were tried without the individuals testifying who allegedly paid the bribes. Further, Kelley did not contend that the testimony of Aguirre and Figueroa would serve to exculpate him, arguing only that it was "material" to the case. In fact, Aguirre and Figueroa were witnesses at the trial and their testimony in no way exculpated Kelley. Preserving their testimony was obviously not the objective in seeking their depositions. Deposing them would only have confirmed what Kelley's counsel already knew, that their testimony would not assist Kelley's defense but might be useful in cross-examining them, a purpose inconsistent with the purposes of Rule 15(a).

■ At the pretrial hearing, Kelley established that Cavazos would be unavailable to testify at trial. However, the district court admitted his affidavit, which was prepared by defense counsel, into evidence and allowed it to be read to the jury. Cavazos' affidavit cannot be characterized as "exculpatory." The affidavit stated that Cavazos believed that the purpose of the bank account was to enable Kelley to hide money from his wife. Even if true, this failed to exculpate Kelley, as there was never a charge that Cavazos knew the account would become the receptacle for bribe money.

At best, the affidavit corroborates Kelley's testimony that his original intention in opening the account was to hide money from his wife. However, Kelley admitted that the account was never used for that purpose. In addition, the affidavit corroborates the fact that Kelley helped Cavazos open the account, that Cavazos signed several checks in blank "for [Kelley's] use," and that Cavazos turned the entire account over to Kelley. Thus, both the "exculpatory" and "material" elements of the Cavazos affidavit are lacking, and it offers little, if any, support to Kelley's claim of "exceptional circumstances."

■ Kelley also sought to depose the records custodians of Megasistemas and Informatica in order to obtain various documents. In criminal cases, depositions are not the appropriate vehicle for pretrial document discovery. Kelley had adequate opportunity to demand or issue subpoenas requiring the production of documents and to address the existence of any additional relevant documents on cross-examination of Aguirre and Figueroa, co-owners of Megasistemas, which he did not do. In addition, Kelley has not contended or shown that the voluminous documents introduced at the trial were incomplete or that he was prejudiced by any lack of documents.

Because Kelley has failed to meet his burden of showing that "exceptional circumstances" compelled any of the requested depositions, the district court's denial of Kelley's motion for leave to take depositions was not an abuse of discretion.

### 2. *Continuance*

■ Kelley also challenges the district court's denial of his motion for a trial continuance. The Speedy Trial Act provides that (1) in any case in which a plea of not guilty is entered, a trial shall commence within seventy days from the filing date or indictment, and (2) unless the defendant consents in writing to the contrary, the trial shall not com-

mence less than thirty days from the date on which the defendant first appears. 18 U.S.C. § 3161(c). Section 3161(h)(8)(A) further provides that the trial judge may grant a continuance if he finds that the ends of justice served by taking such action outweigh the best interests of the public and the defendant in a speedy trial.[5] Finally, Section 3161(h)(8)(B) provides a non-exhaustive list of factors which a judge shall consider in determining whether to grant a continuance, including the complexity of the case. *See* 18 U.S.C. § 3161(h)(8)(B)(ii). Kelley argues that the "ends of justice" necessitated a trial continuance in this complex case.

 A denial of a motion for a trial continuance is reviewed for an abuse of discretion, *United States v. Poston,* 902 F.2d 90, 96 (D.C.Cir.1990). In order to obtain a reversal, a defendant must show that actual prejudice resulted from denial of the continuance. *United States v. Aviles,* 623 F.2d 1192, 1197 (7th Cir.1980).

Citing *United States v. Thomas,* 774 F.2d 807, 810 (7th Cir.1985), *cert. denied,* 475 U.S. 1024, 106 S.Ct. 1218, 89 L.Ed.2d 329 (1986), Kelley argues that the "ends of justice" necessitated a trial continuance in this complex case. *Thomas,* which involved six defendants and thousands of financial documents, is distinguishable. In *Thomas,* the court properly granted a continuance after the moving party described with great specificity the nature of the unusual complexity of the case. Kelley, on the other hand, describes the complexity of his case in more generalized terms: "this complex international public corruption case ... charging appellant with two separate bribery schemes, involving two substantial computer services contracts that were carried out largely in Guatemala."

Regardless of whether the case was sufficiently complex, Kelley has not demonstrated that the failure of the trial court to grant him a continuance prejudiced his ability to mount a defense. In *Aviles,* the court rejected the defendant's argument that he had been prejudiced by the district court's failure to grant a continuance, finding that "[o]n the contrary, the record reveals that defense counsel

conducted an extensive and effective direct examination and cross-examination of the witnesses who testified at trial which exhibited a level of performance far exceeding the minimum standards of professional competence." 623 F.2d at 1196. The same is true here.

The record reflects that, despite the complexity of the case, being faced with the difficult task of locating and assimilating all of the data and developing a cogent defense strategy, at trial defense counsel exhibited a remarkable understanding of the facts and, through effective direct and cross-examination, presented a coherent, although ultimately not persuasive, explanation of Kelley's activities. Considering the amount and quality of the evidence presented against Kelley and the high quality of his defense, we conclude that Kelley was not prejudiced by the district court's denial of a continuance.

#### B. *Denial of Kelley's Motion for Acquittal*

 Kelley argues that the trial court erred in denying his motion for a judgment of acquittal on the charge of obstructing a proceeding under 18 U.S.C. §§ 1505 and 1512, contending that there was insufficient evidence for the jury to convict him on those charges. Our standard of review in considering the denial of a motion for acquittal is that followed by the trial judge in ruling on the motion: "viewing the evidence in the light most favorable to the Government ... and recognizing that it is the jury's province to determine credibility and to weigh the evidence, a reasonable jury must necessarily entertain a reasonable doubt on the evidence presented" in order for us to reverse the denial of such a motion. *United States v. Johnson,* 952 F.2d 1407, 1409 (D.C.Cir.1992). In making this determination, we reach our own independent judgment as to the sufficiency of the evidence. *Id.* See also *United States v. Sutton,* 801 F.2d 1346, 1358 (D.C.Cir.1986) (applying same standard).

---

5. The burden is on the movant to show that the "ends of justice" require a continuance of the trial. *See* 18 U.S.C. § 3161(h)(8)(A); *United States v. Poston,* 902 F.2d 90, 96 (D.C.Cir.1990).

### 1. *The 18 U.S.C. § 1505 Charge*

■ Kelley challenges both the trial court's denial of his motion for judgment of acquittal and the sufficiency of the evidence on two grounds. First, he argues that the government failed to establish the existence of a "proceeding" as defined by § 1505. Second, he argues that § 1505 is unconstitutionally vague. 18 U.S.C. § 1505 provides that "[w]hoever corruptly ... obstructs or impedes or endeavors to influence, obstruct, or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States" shall be guilty of the offense of obstruction of justice as defined by this statute. 18 U.S.C. § 1505.

Kelley argues that § 1505 applies only to adjudicatory or rule-making activities, and does not apply to wholly investigatory activity. Although this Court has not previously addressed this issue, we hold that the formal investigation opened by the Office of the Inspector General of AID was a "proceeding" within the meaning of § 1505.

On several occasions, other courts have held that agency investigative activities are proceedings within the scope of § 1505. *See, e.g., United States v. Sutton,* 732 F.2d 1483, 1490 (10th Cir.1984); *United States v. Vixie,* 532 F.2d 1277, 1278 (9th Cir.1976); *United States · v. Batten,* 226 F.Supp. 492, 493 (D.D.C.1964), *cert. denied,* 380 U.S. 912, 85 S.Ct. 898, 13 L.Ed.2d 799 (1965), *reh'g denied,* 381 U.S. 930, 85 S.Ct. 1557, 14 L.Ed.2d 688 (1965). In those cases, the investigations typically have involved agencies with some adjudicative power, or with the power to enhance their investigations through the issuance of subpoenas or warrants. *See Sutton,* 732 F.2d at 1490 (Department of Energy investigation including issuance of administrative subpoena was proceeding under § 1505); *Vixie,* 532 F.2d at 1278 (IRS investigation including issuance of subpoena was a proceeding under § 1505); *Batten,* 226 F.Supp. at 493 (SEC investigation with authority to issue subpoenas and administer oaths was "proceeding" under § 1505).

For an investigation to be considered a proceeding, then, it must be more than a "mere police investigation." *See Batten,* 226 F.Supp. at 493. In *Batten,* the court explained that the SEC's authority to issue subpoenas and administer oaths in conjunction with its investigations made an SEC investigation a § 1505 proceeding. *Id.; cf. United States v. Higgins,* 511 F.Supp. 453 (W.D.Ky.1981) (because FBI was not vested with rule making or adjudicative power related to subject of indictment, its investigation was not a proceeding under § 1505).

The Inspector General's office of AID is charged with the duty of supervising investigations relating to the proper operation of the agency. *See* 5 U.S.C.App. 3 § 2. In addition, the Inspector General is empowered to issue subpoenas and to compel sworn testimony in conjunction with an investigation of agency activities. Accordingly, the Inspector General's inquiries, albeit preliminary, constitute a "proceeding" within the meaning of § 1505.

■ Kelley next argues that his conviction must be overturned because § 1505 is unconstitutionally vague. He relies on *United States v. Poindexter,* 951 F.2d 369, 379 (D.C.Cir.1991), *cert. denied,* — U.S. —, 113 S.Ct. 656, 121 L.Ed.2d 583 (1992), where we found that the defendant could not constitutionally be convicted under § 1505 for his own independent lies. In *Poindexter,* we observed that the term "corruptly," as used in § 1505 ("[w]hoever corruptly ... obstructs proper administration of the law ...") commands a "transitive" interpretation (A corrupts B), in contrast with an "intransitive" interpretation (A is or becomes corrupt). *Id.* at 377–86.

Under this interpretation of § 1505, Kelley must have "corrupted" someone else; he must have encouraged or influenced someone other than himself to lie to the Inspector General to impede the progress of the investigation. Kelley argues that the indictment charged and the evidence produced at trial purportedly implied the "intransitive" interpretation of "corruption" because the indictment failed to charge the defendant with corrupting third parties. This argument is meritless in light of the facts of this case. It is abundantly clear that Kelley suborned others to obstruct justice. The record shows

that Kelley enlisted Derbes, and attempted to enlist his ex-wife Parera, to lie to the Inspector General and to falsify documents. Such conduct falls squarely within *Poindexter*'s "transitive" interpretation of "corruption" and thus the conviction under § 1505 cannot be reversed on the grounds that the statute is unconstitutionally vague as applied to Kelley's conduct.

### 2. *The 18 U.S.C. § 1512 Charge*

■ Kelley also challenges the sufficiency of the evidence that he conspired to influence the testimony of another person in an official proceedings in violation of 18 U.S.C. § 1512. The "official proceedings" cited in the indictment were a federal grand jury and the investigation being conducted by the AID Office of the Inspector General. Despite Kelley's arguments to the contrary, the grand jury proceeding and the Inspector General's investigation constituted "official proceedings" within the meaning of § 1512.

■ We need not decide whether "proceeding" has the same meaning in both § 1505 and § 1512, since the parties agree that a parallel should be drawn between the two sections. For the purposes of this discussion, therefore, we assume that the AID Inspector General's investigation was a proceeding under § 1512 as well as § 1505. With respect to that investigation, there was sufficient evidence to find that Kelley influenced at least Derbes' statements to the Inspector General. Kelley was aware that his activities were under investigation by the Inspector General, and he was in close communication with Derbes while the Inspector General was questioning Derbes. Derbes testified that his conversations with Kelley "were around [sic] the interview with the inspector, what the situation was, and about how to go about with the lies that I had made ... and how to make it look more truthful."

■ We reach the same conclusion with respect to Kelley's influencing of testimony before the grand jury proceeding. A conviction under § 1512 does not require proof that a grand jury proceeding was actually pending or was about to be instituted at the time the defendant committed the charged obstructive acts. *See* 18 U.S.C.

§ 1512(e)(1). It therefore follows that § 1512 does not require explicit proof of knowledge on the part of Kelley that such proceedings were pending or were about to be instituted. *See United States v. Scaife,* 749 F.2d 338, 348 (6th Cir.1984).

The statute only requires that the jury be able reasonably to infer from the circumstances that Kelley, fearing that a grand jury proceeding had been or might be instituted, corruptly persuaded persons with the intent to influence their possible testimony in such a proceeding. *See United States v. Shively,* 927 F.2d 804, 811 (5th Cir.), *cert. denied,* 501 U.S. 1209, 111 S.Ct. 2806, 115 L.Ed.2d 979 (1991) ("Under this statute, intent may, and generally must, be proved circumstantially."). Because Kelley was well aware that his activities were under investigation by the Inspector General, a jury could reasonably infer that Kelley knew a criminal investigation, including a grand jury proceeding, might well be forthcoming, and that the persons he tried to corrupt—Derbes and Parera—were likely to be called as witnesses at such a proceeding. Moreover, Derbes testified that the Inspector General official investigating the case told him that he planned to "pass the case to the grand jury." Based on their continuous close communication, it would be reasonable for a jury to infer that Kelley also possessed this information. We therefore affirm his conviction under § 1512.

### C. *Offense Level Under the Sentencing Guidelines*

■ Finally, Kelley argues that the district court erred in imposing the two-level increase in his offense level under U.S.S.G. § 3B1.1(c) on the ground that he was an "organizer" or "leader" in the criminal activity, and under U.S.S.G. § 3C1.1 on the ground that he obstructed justice. On review, we give due deference to the district court's application of the sentencing guidelines to the facts, and we accept the district court's findings of fact unless they are clearly erroneous. 18 U.S.C. § 3742; *United States v. Kim,* 23 F.3d 513, 516 (D.C.Cir.1994).

■ Despite Kelley's contentions, it is clear that he played an aggravating role as a

"leader" or "organizer" of the criminal activity, thereby warranting the two-level increase in his offense level. Kelley argues that § 3B1.1(c) applies only to one who exercises control over criminally responsible subordinates. We agree with the cases cited by Kelley in support of this proposition.[6] However, we disagree with Kelley's application of that law to the facts of his case.

We look to the Commentary in the United States Sentencing Commission Guidelines Manual[7] for assistance in determining whether Kelley was a leader or organizer within the meaning of § 3B1.1(c). According to the Commentary, relevant factors include (1) exercise of decision-making authority; (2) nature of participation in the commission of the offense; (3) recruitment of accomplices; (4) claimed right to a larger share of the fruits of the crime; (5) degree of participation in planning or organizing the offense; (6) nature and scope of the illegal activity; and (7) degree of control and authority exercised over others. U.S.S.G. § 3B1.1, comment. (n. 3).

Kelley's conduct satisfies not only some but all of these factors. He devised each detail of both the Megasistemas and Informatica bribery schemes, instructed and even coerced Aguirre, Figueroa, and Derbes to assist him in carrying out his plan, thus satisfying factors 1, 2, 5, 6, and 7. He sought out both knowing and unwitting accomplices (Aguirre, Figueroa, Derbes, de Ferrari, and Cavazos, for example) to aid in his scheme, satisfying factor 3. Though some of the money was distributed to the others, almost all was used for Kelley's benefit, i.e., as down payment on his new home or to clear outstanding debts, thus satisfying factor 4.

Kelley's argument that he exercised no significant degree of control over others—factor 7—is wholly specious. First, this factor alone does not determine whether the sentence can be increased. *See* U.S.S.G. § 3B1.1, comment. (n. 3). Moreover, Kelley did exercise substantial control over Aguirre, Figueroa, Derbes, and Cavazos in carrying out his kickback and cover-up schemes. For example, he instructed Aguirre and Figueroa to remove mention of PACE from their proposal, and they complied. He instructed them to obtain black market checks and send them to certain unexplained persons, and they obeyed. Whether or not Kelley actually did have the authority to approve payments to Megasistemas for CIMS work is irrelevant, for Aguirre and Figueroa clearly believed, as he told them, that he possessed the authority to withhold their payments if they did not cooperate. Finally, Kelley directed both Derbes and Cavazos to open bank accounts to receive his kickback money, and even assisted them in opening the accounts. He recommended that Derbes submit a proposal to ERA on behalf of Informatica, and Derbes did so with Kelley's help. Kelley discussed with Derbes how his activities would be concealed, and Derbes repeated these stories to investigators.

The district court properly characterized Kelley as a leader or organizer. Based on the evidence he was *the* leader and organizer, and, therefore, the district court properly calculated Kelley's base offense level under the sentencing guidelines.

Kelley further argues that the district court erred in enhancing his base offense level by two points pursuant to U.S.S.G. § 3C1.1 for obstruction of justice. He argues that the district court relied solely upon the obstruction convictions in increasing the sentence, and that therefore if the obstruction convictions fall, so should the sentence based upon them.

---

**6.** For the proposition that § 3B1.1 applies only to those who exercise control over others, Kelley cites *United States v. Hoac,* 990 F.2d 1099 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1075, 127 L.Ed.2d 392 (1994); *United States v. Litchfield,* 959 F.2d 1514, 1522–23 (10th Cir. 1992); *United States v. Rowley,* 975 F.2d 1357 (8th Cir.1992); and *United States v. Belletiere,* 971 F.2d 961 (3rd Cir.1992). For the proposition that the defendant must have exercised control over criminally culpable persons, Kelley cites

*United States v. DeCicco,* 899 F.2d 1531, 1535 (7th Cir.1990).

**7.** Commentary in the Sentencing Guidelines Manual that interprets or explains the guideline is authoritative unless it violates the Constitution or a federal statute or is inconsistent with or is a plainly erroneous reading of the guideline. *Stinson v. United States,* —— U.S. ——, ——, 113 S.Ct. 1913, 1915, 123 L.Ed.2d 598 (1993).

Kelley was convicted of obstruction of justice under 18 U.S.C. § 1505 for conspiring to impede the "proper administration of the law" before the AID Inspector General. He was also convicted of obstruction of justice under 18 U.S.C. § 1512(b)(1) for conspiring to influence the testimony of another person in an official proceeding and for making false statements. Application Note 3 of the Commentary to U.S.S.G. § 3C1.1 sets forth an explicit, though non-exhaustive, list of examples of the type of conduct to which the two-point enhancement applies and specifically includes on that list "conduct prohibited by 18 U.S.C. §§ 1501–1516." *See* U.S.S.G. § 3C1.1, comment. (n. 3(i)). Therefore, the district court's two-point enhancement of Kelley's offense level under § 3C1.1 for obstruction of justice falls squarely within the guidelines. Because, as we have held, the jury had already properly found beyond a reasonable doubt that Kelley committed obstruction of justice under 18 U.S.C. §§ 1505 and 1512, there can be no error in the judge finding by a mere preponderance of the evidence that Kelley obstructed justice under § 3C1.1 by committing the type of "conduct prohibited by 18 U.S.C. §§ 1501–1516." *See United States v. Pofahl,* 990 F.2d 1456 (5th Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 266, 126 L.Ed.2d 218 (1993) (applying § 3C1.1 application note 3(i) to 1512(b)(1) "type" conduct).

### III. CONCLUSION

For the reasons articulated above, Kelley's conviction and sentence are

*Affirmed.*