# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 17, 2014            Decided June 10, 2014

No. 12-3082

UNITED STATES OF AMERICA,
APPELLEE

v.

OLABIMPE M. OLEJIYA, ALSO KNOWN AS BIM,
ALSO KNOWN AS BIMPE,
APPELLANT

———

No. 12-3090

UNITED STATES OF AMERICA,
APPELLEE

v.

OLUYINKA AKINADEWO, ALSO KNOWN AS OLU BLACK,
ALSO KNOWN AS OLU DUDU, ALSO KNOWN AS OLU,
APPELLANT

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:11-cr-00150)

———

*Lisa B. Wright*, Assistant Federal Public Defender, argued the cause for appellant Akinadewo. *Richard Seligman*, appointed by the court, argued the cause for appellant Olejiya. *A.J. Kramer*, Federal Public Defender was on brief. *Tony Axam Jr.*, Assistant Federal Public Defender, entered an appearance.

*Anne Y. Park*, Assistant United States Attorney, argued the cause for the appellee. *Ronald C. Machen Jr.*, United States Attorney, and *Elizabeth Trosman*, *Suzanne G. Curt* and *Bryan G. Seeley*, Assistant United States Attorneys were on brief.

Before: HENDERSON and MILLETT, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*:  Olabimpe Olejiya and Oluyinka Akinadewo both pleaded guilty to one count of conspiracy to commit bank fraud based on their participation in a scheme that involved opening fraudulent bank accounts in the name of unwitting individuals, funding the accounts with fraudulent checks and wire transfers and withdrawing funds before the accounts' fraudulent nature was detected.  They now raise parallel challenges to their sentences, claiming that the district court erred in calculating their respective United States Sentencing Guidelines offense levels by (1) improperly applying an aggravated role enhancement of three levels for Olejiya and four for Akinadewo, *see* U.S.S.G § 3B1.1, and (2) failing to make the factual findings necessary to support a 12-level increase for both based on the amount of intended loss involved in the conspiracy, *see* U.S.S.G. § 2B1.1(b)(1).  For the reasons that follow, we affirm the district court's judgments.

## I. Background

As admitted by Olejiya and Akinadewo in their plea proceedings, the conspiracy lasted from April 2007 to December 2007. The conspiracy's goal—enriching its members—was achieved by the following overt acts. On September 12, 2007, two checking accounts were opened at E*Trade via the internet, using the name, birthdate and social security number of A.S. A.S., however, was unaware of the accounts and had given no one permission to use his personal information. In the following months, members of the conspiracy transferred $109,200 from A.S.'s legitimate account at the Armed Forces Bank to the two fraudulent E*Trade accounts set up in his name and withdrew over $50,000 of that amount before the fraud was detected. Moreover, beginning as early as July 2007, numerous calls from a cell phone belonging to Akinadewo were made to both Armed Forces Bank and E*Trade in an apparent effort to monitor accounts. Akinadewo did not have a legitimate account at either bank. On October 6 and 8, 2007, Akinadewo used a debit card associated with one of the fraudulent E*Trade accounts to purchase twelve money orders, each worth $500, from a Walmart in Landover Hills, Maryland. On October 7, 2007, Olejiya purchased four $500 money orders from three Walmart stores in Laurel, Bowie and Landover Hills, Maryland.

Another fraudulent checking account in the name of A.S.—this one at Branch Banking and Trust (BB&T)—was opened via the internet on August 25, 2007. Although Akinadewo did not have an account at BB&T, six calls were made to the bank from his phone during the time of the conspiracy. On September 11, 2007, Akinadewo made an initial deposit of $50 in the account at a BB&T branch in the District of Columbia. Three days later, he made another $50

deposit at a Maryland branch. On October 3, 2007, using an ATM in Silver Spring, Maryland, Akinadewo deposited a $20,000 check, drawn on one of the fraudulent E*Trade accounts, into the fraudulent BB&T account. The next day, he attempted to repeat the maneuver with a $30,000 check drawn on one of the E*Trade accounts but it bounced. All told, members of the conspiracy successfully withdrew over $30,000 from the BB&T account by cashing checks drawn on the account and making ATM withdrawals.

On November 3, 2007, the name, birthdate and social security number of another unwitting individual, U.J., were used to open another BB&T checking account via the internet. That account was funded with $8,000 transferred from yet another fraudulent account, this one opened with Charles Schwab in the name of A.S. According to Olejiya, on November 30, 2007, he contacted Akinadewo and informed him that another conspirator, Samuel Akinleye, was willing to cash a check written on the fraudulent BB&T account in the name of U.J. Akinadewo then met up with Olejiya and Akinleye, wrote a $4,000 check to Akinleye and signed U.J's name. Akinadewo instructed Akinleye to cash the check and return the money to Akinadewo, which Akinleye did in exchange for a portion of the proceeds. During his plea colloquy, Akinadewo denied any recollection of writing the check on November 30, 2007, instead stipulating more generally that "during the time period of the conspiracy, [he] had access to checks in others' names, and provided some of these checks to co-conspirators to either cash or deposit." 4/20/12 Tr. 30–31.

All told, the conspiracy resulted in actual losses of $90,987.48 before the fraud was detected, which amount includes all of the funds withdrawn from the fraudulent accounts. When the funds that passed through the fraudulent

accounts are added, the intended loss of the conspiracy totals $363,939.76.

On May 13, 2011, a grand jury returned a one-count indictment charging Olejiya and Akinadewo with conspiracy to commit bank fraud in violation of 18 U.S.C. §§ 1344 and 1349. On March 22, 2012, Olejiya entered a plea of guilty. Olejiya's presentence report (PSR) calculated his Guidelines range at 41-51 months, based on a criminal history category of II and an offense level of 21. The offense level included a 3-level enhancement, to which Olejiya objected, for his role as a "manager or supervisor." *See* U.S.S.G. § 3B1.1(b). It also included a 12-level increase for an intended loss from the offense greater than $200,000, to which Olejiya objected solely on fairness grounds, asking the district court to grant a variance from the Guidelines. *See* U.S.S.G. § 2B1.1(b)(1)(G). At the sentencing hearing, the district court found that Olejiya qualified for the 3-level aggravated role enhancement and the 12-level increase and sentenced him to 35 months' imprisonment.[1] He timely appealed.

Akinadewo pleaded guilty on April 20, 2012. His PSR calculated the applicable Guidelines range at 41-51 months, based on a criminal history category of II and an offense level of 21. Akinadewo's offense level included a 4-level enhancement for his role as an "organizer or leader," *see* U.S.S.G. § 3B1.1(a), and a 12-level increase for the loss amount, *see* U.S.S.G. § 2B1.1(b)(1)(G). Like Olejiya, Akinadewo objected to the aggravated role enhancement and made a similar "fairness" objection to the loss amount. At the

---

[1] The district court sentenced Olejiya to a six-month concurrent term on one count of misuse of a passport in violation of 18 U.S.C. § 1544, which charge resulted from Olejiya's attempt to flee to Canada to avoid prosecution.

sentencing hearing, the district court found that Akinadewo qualified for the 4-level aggravated role enhancement and the 12-level increase and sentenced him to 46 months' imprisonment.   He timely appealed.

## II.   Aggravated Role

Olejiya and Akinadewo both argue that the district court erred by enhancing their respective offense levels by three and four points for their aggravated roles in the offense.   "In reviewing a sentencing decision, we address purely legal questions *de novo*, accept the district court's factual findings unless they are clearly erroneous, and give 'due deference' to that court's application of the Guidelines to the facts."   *United States v. Saani*, 650 F.3d 761, 765 (D.C. Cir. 2011).   The district court's fact-specific determination that a defendant was an "organizer or leader" or a "manager or supervisor" warrants due deference, *see United States v. Quigley*, 373 F.3d 133, 138 (D.C. Cir. 2004); *United States v. Yeh*, 278 F.3d 9, 15 (D.C. Cir. 2002), a standard which reflects "the recognition that the district courts should be afforded some flexibility in applying the guidelines to the facts before them," *United States v. Kim*, 23 F.3d 513, 517 (D.C. Cir. 1994); *see also United States v. Tann*, 532 F.3d 868, 874 (D.C. Cir. 2008) (due deference standard survives *United States v. Booker*, 543 U.S. 220 (2005)).

The Guidelines provide for an increase in the offense level if the defendant played an aggravated role in the offense:

> (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

(b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels . . . .

U.S.S.G. § 3B1.1.   We consider several factors in applying the aggravated role enhancement, including

the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

*Id.* cmt. n.4; *see also United States v. Graham*, 162 F.3d 1180, 1185 n.5 (D.C. Cir. 1998) (although factors distinguish between 3- and 4-level enhancement, they are relevant to whether any aggravated role enhancement applies).   No single factor is dispositive.   *Graham*, 162 F.3d at 1185; *see also United States v. Brodie*, 524 F.3d 259, 270 (D.C. Cir. 2008); *United States v. Kelley*, 36 F.3d 1118, 1129 (D.C. Cir. 1994).

## A.   Olejiya

Olejiya argues that the district court erred in applying the "manager or supervisor" enhancement because he did not exercise "control" over criminally liable subordinates.   The defendant must manage or supervise one or more other *participants* in the criminal activity—not simply the property or assets of the conspiracy, as, according to Olejiya, the district court concluded—in order to warrant an aggravated role enhancement.   U.S.S.G. § 3B1.1 cmt. n.2.   We have said that "[a]ll persons receiving an enhancement [under § 3B1.1] must

exercise some control over others." *Graham*, 162 F.3d at 1185; *accord United States v. Clark*, 747 F.3d 890, 896 (D.C. Cir. 2014); *United States v. Smith*, 374 F.3d 1240, 1250 (D.C. Cir. 2004). We elaborated on this statement in *Quigley*, explaining that "[w]e understand the concept of 'control' or 'authority,' implicit in the notion of 'management' or 'supervision,' to connote some sort of hierarchical relationship, in the sense that an employer is hierarchically superior to his employee." 373 F.3d at 140.[2]

During Olejiya's sentencing hearing, the district court heard testimony from Special Agent Spencer Brooks of the Federal Bureau of Investigation (FBI). He explained that conspirators in this type of bank fraud play different roles. High-level participants typically control the fraudulent bank accounts, checkbooks and debit cards and are responsible for funding the accounts. Low-level participants—often referred to as "runners"—are typically recruited by high-level participants to do the front-line work of cashing fraudulent checks. In exchange, the runners receive a small portion of the proceeds. Agent Brooks testified that, consistent with this model, Olejiya recruited runners, including Samuel Akinleye and Okorie Awa, to the conspiracy. Awa was caught on camera cashing three fraudulent checks in the amounts of $3,000, $4,500 and $5,500 and Agent Brooks testified that, according to Awa, Olejiya gave Awa the checks, told him to cash them and paid him between $500 and $1,000 for his

---

[2] One judge of this Court has noted tension between *Graham*'s suggestion that "control" is required for an aggravated role enhancement and the fact that control is but one of several non-dispositive factors listed in the application notes. *See Clark*, 747 F.3d at 897–99 (Randolph, J., concurring). We need not explore that tension here, however, because the district court correctly concluded that both Olejiya and Akinadewo exercised control over other participants.

effort.  The district court credited Agent Brooks' testimony and concluded that, although Olejiya was not the kingpin, he was also not merely a runner but instead at least a manager or supervisor.

Seeing no error in the district court's factual findings and granting due deference to the district court's application of the Guidelines to the facts, we agree that Olejiya was a manager or supervisor.  By recruiting others to the scheme, Olejiya ensured that he would not perform the risky task of cashing a fraudulent check but would instead superintend underlings who performed the task at his behest.  His recruitment of Akinleye and Awa satisfies one of the application note factors and his supervision of Awa's check-cashing demonstrates the existence of others, including decision-making authority and control exercised over others.  *See* U.S.S.G. § 3B1.1 cmt. n.4. This case is more similar to those in which we have found the requisite hierarchical relationship, *see, e.g.*, *Brodie*, 524 F.3d at 270–71; *United States v. Wilson*, 240 F.3d 39, 46–47 (D.C. Cir. 2001); *Kelley*, 36 F.3d at 1129, than it is to those in which the defendant was "simply a barnacle clinging to the outer hull of middle management," *Graham*, 162 F.3d at 1184.

## B.  Akinadewo

Akinadewo also argues that the district court erred in applying the "organizer or leader" enhancement because he did not exercise control over other conspirators.  Akinadewo's argument is considerably weaker than Olejiya's.  Akinadewo stipulated that he had access to the scheme's checkbooks and provided checks to co-conspirators to either cash or deposit, making him the sort of high-level participant that relies on runners to take the risks.  Akinadewo also made several initial deposits to fund the fraudulent accounts and numerous calls were made from his cell phone to the banks used in the scheme,

from which the district court inferred that he was keeping tabs on the various accounts. Although Akinadewo contends that he was merely the account manager, there is ample evidence that he controlled other participants. At Akinadewo's sentencing hearing Agent Brooks testified that, according to Awa, Akinadewo supervised one of Awa's trips to cash a fraudulent check by following in another car; after Olejiya had collected the money from Awa, Olejiya gave it to Akinadewo. Agent Brooks also testified that on one occasion—the one disputed in the plea colloquy—Akinadewo wrote a check to Akinleye for him to cash; Akinleye did so and returned the money to Akinadewo in exchange for a portion of the proceeds. The district court credited Agent Brooks' testimony and found that there was "compelling evidence" that Akinadewo was an organizer or leader. At bottom, Akinadewo asks us to draw an inference from this evidence other than the inference reasonably drawn by the district court but, even if Akinadewo's preferred inference (that he merely managed the accounts) were plausible, we would nonetheless defer to the district court's reasonable application of the Guidelines. *See Yeh*, 278 F.3d at 15.

### III. Loss Amount

The Guidelines provide that, for certain crimes, the offense level is to be increased based on the amount of "loss" involved in the offense, which is defined as "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1(b)(1) & cmt. n.3. The loss amount is one part of the defendant's relevant conduct that—in the case of jointly undertaken criminal activity—includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." *Id.* § 1B1.3(a)(1)(B). Because "the scope of the criminal activity jointly undertaken by the defendant . . . is not necessarily the same as the scope of the entire

conspiracy," *id.* cmt. n.2, "the Guidelines expressly require sentencing courts to determine the scope of each defendant's conspiratorial agreement." *United States v. Mellen*, 393 F.3d 175, 183 (D.C. Cir. 2004); *see United States v. Childress*, 58 F.3d 693, 722–24 (D.C. Cir. 1995). "[W]e have not hesitated to remand for resentencing when the district court has failed to make these individualized findings." *United States v. Graham*, 83 F.3d 1466, 1479 (D.C. Cir. 1996) (collecting cases).

The district court increased both Olejiya's and Akinadewo's offense levels by twelve points to reflect the amount of intended loss involved in the entire conspiracy—$363,939.76. They now contend that the district court failed to comply with the "strict procedural mandate," *Childress*, 58 F.3d at 722, to support the increase by making particularized factual findings regarding the scope of their conspiratorial agreement.

## A. Olejiya

The Government contends that Olejiya waived any challenge to the loss amount by affirmatively conceding below that he was responsible for the full amount of the intended loss involved in the conspiracy. Olejiya contends that he, at most, forfeited the issue. "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993) (quotation marks omitted). "Forfeiture occurs when silence on the part of the appealing party has prevented examination by the trial court and our review is for plain error." *United States v. Laslie*, 716 F.3d 612, 614 (D.C. Cir. 2013) (citations and quotation marks omitted). "By contrast, waiver is intentional, and extinguishes an error so that there is no review, because the

defendant has knowingly and personally given up the waived right." *Id.* (quotation marks omitted). We believe that Olejiya's repeated and emphatic concessions, made in written submissions and at sentencing, constitute a knowing and intentional waiver.

As noted, the PSR calculated Olejiya's offense level as 21, which included a 12-level increase to reflect the full amount of intended loss involved in the conspiracy. In his supplemental sentencing memorandum, Olejiya conceded that the PSR's Guidelines calculation was correct as to the applicable loss amount. *See* Appendix for Appellants (App.) 113 ("The PSR [] quite correctly . . . adds 12 levels . . . ."). He argued, however, that the Guidelines "unfairly dictate consideration of intended loss amounts." *Id.* At Olejiya's sentencing hearing, the prosecutor noted his uncertainty whether Olejiya was disputing the Guidelines calculation or simply asking for a downward variance from the applicable range. *See* 10/11/12 Sent. Tr. 9–10.[3] After the district court inquired, defense counsel repeated his concession that "the probation office correctly calculated the guidelines and that under the guidelines they can and perhaps should take into account the intended loss." *Id.* at 10. Although defense counsel pressed the argument that "the way the guidelines work in these fraud cases . . . [is] not fair," he repeated that Olejiya was "not disputing that under the guidelines, the court can add 12 points." *Id.* at 12; *see also id.* at 78 ("Can you legally accept that? Of course you can. I have admitted that from Day One. . . . I can't appeal it."). As a result of these concessions, the

---

[3] *See generally Gall v. United States*, 552 U.S. 38, 51 (2007) (noting difference between "procedural error" of court's failure to calculate Guidelines range properly and sentence's "substantive reasonableness").

district court treated the loss amount as undisputed. *Id.* at 56, 96.

We recently held that a defendant who conceded the propriety of a sentencing enhancement in a plea agreement and at sentencing waived any challenge to the enhancement because he

> did not merely fail to object to the enhancement; his decision not to challenge the enhancement was deliberate. Starting with his plea agreement and continuing through filings and arguments at his sentencing hearing, [he] affirmed that the district court should use the enhancement in calculating his Guidelines range. His focus was elsewhere, on persuading the court to sentence him *outside* of the Guidelines.

*Laslie*, 716 F.3d at 614; *see also United States v. Jackson*, 346 F.3d 22, 24 (2d Cir. 2003) (finding waiver where defendant conceded applicability of enhancement in letter to sentencing court and at sentencing hearing). So too here. Although, unlike Laslie, Olejiya did not plead guilty pursuant to a plea agreement, he nonetheless conceded that the PSR correctly calculated his Guidelines range. He instead focused his efforts on persuading the court to sentence him below that range.

Whether or not there was a strategic purpose for Olejiya's concession is irrelevant so long as it was indeed a knowing and intentional decision and not a mere oversight: "Even if we could determine counsel's reasons for the concession, the District Court was entitled to rely" on it. *United States v. Moore*, 703 F.3d 562, 572 (D.C. Cir. 2012). *Moore* held that a defendant who objects to the PSR's Guidelines calculation but

subsequently withdraws the objection has waived the opportunity to raise it on appeal. *Id.* at 571–72; *accord United States v. Robinson*, 744 F.3d 293, 298 (4th Cir. 2014); *United States v. Bowers*, 743 F.3d 1182, 1184–85 (8th Cir. 2014); *United States v. Venturella*, 585 F.3d 1013, 1018–19 (7th Cir. 2009). The initial objection is significant because it demonstrates that the defendant did not simply overlook the issue. *See United States v. Zubia-Torres*, 550 F.3d 1202, 1204–07 (10th Cir. 2008) (discussing distinction between waiver and forfeiture in similar case); *cf. Olano*, 507 U.S. at 733. Although Olejiya did not withdraw an initial objection, we nevertheless think it plain that he was aware of the relevant conduct issue and simply chose not to contest it. The Government's sentencing memorandum—under a bold-faced heading labeled "Enhancement . . . for Loss Amount"—cited *Childress* for the proposition that only conduct reasonably foreseeable to the defendant can be attributed to him at sentencing. App. 86–87. And at the sentencing hearing, the district court made a point of clarifying that Olejiya's acceptance of the loss amount calculation in his sentencing memorandum was indeed a knowing concession that no procedural error had occurred. *See* 10/11/12 Sent. Tr. 9–10.

Just as "[t]his court does not allow parties to reopen issues waived by stipulation at trial . . . , we will not review a belated challenge on an issue a party agreed not to dispute in sentencing proceedings below." *Laslie*, 716 F.3d at 615 (citing *United States v. Harrison*, 204 F.3d 236, 240 (D.C. Cir. 2000)); *cf. United States v. Warren*, 42 F.3d 647, 658 (D.C. Cir. 1994) (defendant waived argument that crack cocaine found in cigarette package should not have been considered in calculating Guidelines offense level after conceding opposite below). Olejiya waived any argument that the district court committed procedural error.

## B. Akinadewo

As noted, Akinadewo did not raise the loss attribution issue below. The Government contends that he waived his challenge to the loss amount by conceding that the Guidelines were correctly calculated. We assume without deciding that Akinadewo merely forfeited the issue because we conclude that he cannot establish plain error. *See Tann*, 532 F.3d at 872.

On plain-error review, the defendant bears the burden of demonstrating that any error was prejudicial. *Olano*, 507 U.S. at 734. In the sentencing context, that burden is "slightly less exacting than it is in the context of trial errors." *United States v. Saro*, 24 F.3d 283, 287 (D.C. Cir. 1994). Nonetheless, the defendant must "offer some reason to suspect that the District Court's error likely resulted in an incorrect sentence." *United States v. Williams*, 358 F.3d 956, 966 (D.C. Cir. 2004). Akinadewo has not done so.

The Government's "Flow of Funds" chart, as Akinadewo concedes, explicitly links him to $126,200 in stolen funds—a $109,200 wire transfer from A.S.'s legitimate Armed Forces Bank account to two fraudulent E\*Trade accounts and a $17,000 check drawn on another legitimate account and deposited in the fraudulent Charles Schwab account.[4] Although that amount is less than the $200,000 necessary for the 12-level enhancement, Akinadewo has given us no reason to believe the district court would likely reach a different sentence. As discussed, Akinadewo played a supervisory role

---

[4] Akinadewo deposited a $20,000 check and attempted to deposit another $30,000 check, both drawn on the fraudulent E\*Trade accounts. He also purchased $6,000 in money orders using a debit card associated with the E\*Trade accounts.

in the scheme and had access to the checkbooks for the fraudulent accounts. From the numerous calls made from Akinadewo's cell phone (or his sister's) to all of the banks involved in the scheme, the district court inferred that Akinadewo was checking the balances on the accounts. It was therefore "reasonably foreseeable" to Akinadewo that more than $200,000 in fraudulent funds was in fact held in those accounts and thus involved in the conspiracy. U.S.S.G. § 1B1.3(a)(1)(B); *see United States v. Wilson*, 605 F.3d 985, 1036–37 (D.C. Cir. 2010) (relying in part upon defendant's "regular and constant communications with Mr. Franklin about the quantity of PCP on the street" to establish conspiracy's entire amount was foreseeable by, and therefore attributable to, defendant). Because the balance in the fraudulent accounts formed the basis for the district court's loss calculation, we have no reason to think that the district court would attribute a lower amount to Akinadewo on remand. *See Childress*, 58 F.3d at 724 (no plain error where it is not "reasonably likely that the district court would have assigned [defendant] a different and lower base offense level if it had made the requisite findings").

For the foregoing reasons, we affirm the judgments of the district court.

*So ordered.*