Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued May 10, 2004          Decided July 6, 2004

No. 03-3059

UNITED STATES OF AMERICA,
APPELLEE

v.

DOROTHY QUIGLEY,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 01cr00082–01)

———

*Lisa B. Wright*, Assistant Federal Public Defender, argued the cause for appellant. With her on the briefs was *A. J. Kramer*, Federal Public Defender.

*Patricia A. Heffernan*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Roscoe C. Howard, Jr.*, U.S. Attorney, *John R. Fisher*, *Roy W. McLeese III*, and *Virginia Cheatham*, Assistant U.S. Attorneys.

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

Before: GINSBURG, *Chief Judge*, and SENTELLE and ROBERTS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SENTELLE.

SENTELLE, *Circuit Judge*: Dorothy Quigley appeals from a judgment sentencing her to twenty-seven months' imprisonment. Her sole argument on appeal is that the district judge improperly enhanced her offense level by four levels pursuant to the "organizer or leader" role enhancement under § 3B1.1(a) of the United States Sentencing Guidelines. For the reasons more fully set forth below, we agree with appellant that the district court erred in imposing this enhancement, and therefore vacate the judgment and remand for resentencing.

I.

In January 2000, Federal Bureau of Investigation agents confronted Quigley concerning her involvement in a scheme to defraud the federal government. The scheme involved land "flips" in the District of Columbia. Quigley operated as the real estate agent for co-conspirators, helping them buy and then sell (that is, "flip") D.C. properties that were in general disrepair. She aided her conspirators in obtaining a higher price for the land by hiring appraisers who would value the land at an inflated cost. Most of the purchasers could not qualify for the federally insured mortgages critical to the success of the scheme. To solve this problem, Quigley would help the buyers qualify for federally insured mortgages through the Federal Housing Administration ("FHA"), part of the Department of Housing and Urban Development ("HUD"). She helped buyers to get false income records, misrepresenting their ability to pay the mortgage, and at times gave them down-payment money. At the time of the plea agreement, thirteen of the forty-two such loans she had helped to procure from the FHA were in default, resulting in an estimated loss of around $700,000 to the federal government.

After she was approached by the FBI, Quigley and the United States entered a plea agreement. The agreement provided that Quigley would plead guilty to one count of

conspiracy to defraud the United States and to make false statements within HUD's jurisdiction and would cooperate with the government in investigating the fraud in which she was involved. In return, the government agreed to drop all other potential charges and not to use any information that Quigley provided against her. The government also agreed to consider moving for a downward departure pursuant to § 5K1.1 of the United States Sentencing Guidelines if Quigley's assistance was substantial.

The parties estimated the final offense level at 18, based on a reading of the 1999 edition of the Guidelines, the version that applied to Quigley. The plea agreement computed that level as follows: (1) a base-offense level of 6, *see* U.S. Sentencing Guidelines Manual § 2F1.1 (1999) (repealed and consolidated with § 2B1.1 effective Nov. 1, 2001) ("USSG"); (2) a loss amount of between $500,000 and $800,000, which added ten levels to the sentence; and (3) a two-level upward adjustment for more-than-minimal planning under § 2F1(b)(2). The government also agreed not to oppose an additional three-level downward adjustment for acceptance of responsibility. The agreement said nothing about role enhancements. Finally, the agreement noted that the court alone would determine the applicable guideline range, and said that the government "cannot and does not make any promises, representations or predictions regarding what sentence the Court will impose."

In April 2001, Quigley pleaded guilty to one count of conspiracy to defraud the United States and to make false statements within HUD's jurisdiction. At her guilty plea hearing, the government submitted a two-page factual proffer that appellant had acknowledged was accurate. That proffer is not in the record; neither party apparently can locate it and it was not formally filed with the district court. The government, however, summarized the proffer's contents at the hearing:

> Ms. Quigley is a real estate agent in D.C. who used her skills to further a conspiracy to illegally obtain FHA

insured mortgages based on fraudulently inflated appraisals and falsely qualified buyers.

Ms. Quigley participated in approximately 42 home sales that were based on these fraudulent appraisals and falsely qualified buyers. At the time of her plea agreement, thirteen of the 42 properties were already in default or foreclosure, with estimated losses to the FHA and HUD of over $700,000.

The government will primarily be relying on a written factual proffer that was provided in advance to defense counsel and to the court, and which has been signed today by Ms. Quigley and her counsel.

The district court also examined Quigley in open court concerning the contents of the proffer:

THE COURT: Is it correct that on a substantial number of occasions, the government says there were 42–at least 42 of these, but at least on a substantial number, that you in agreement and in cooperation with a number of other individuals who the government has simply identified as co-conspirators, that you identified properties which could be used for the FHA insured loan program, that you identified potential buyers, and that you helped those buyers appear to get qualified for the loans, and by that I mean that you helped get false pay stubs for them, that in some instances you had them indicate that they were getting their down payment as a gift from a relative, which is legal, when, in fact, one of the co-conspirators was providing the money for the down payment.

Are those facts correct?

MS. QUIGLEY: Yes.

THE COURT: Is it also true that you arranged for appraisals on the property, and that you provided the appraiser with the contract price which resulted in getting an inflated price for insurance purposes from FHA?

MS. QUIGLEY: Yes.

THE COURT: And, of course, you were working with other people to do that, is that correct?

MS.QUIGLEY: That is correct.

After her plea, Quigley's sentencing was continued to allow her time to cooperate with the government. The government filed a sealed § 5K1.1 motion, requesting that the sentencing court depart downward three levels. According to that motion, Quigley's information was very useful and resulted in multiple leads, recorded conversations, search warrants, and other guilty pleas. (Quigley's brief states that the trial prosecutor has confirmed that this summary of sealed material does not reveal any nonpublic information.)

The presentence report contained additional facts relevant to Quigley's role in the conspiracy. The report, which the parties have not included in the appendix but is quoted extensively in Quigley's brief, confirms the facts Quigley admitted at the plea hearing. Quigley acknowledged that there were no "material/factual inaccuracies" in the PSR. The report's sentencing calculation agreed with the sentencing calculations contained in Quigley's plea agreement, thus starting from a total offense level of 18. The report reduced the sentence three levels for acceptance of responsibility, leading to an offense level of 15, not counting any reduction that might result from the government's § 5K1.1 motion. The report did not recommend that a role adjustment be added to Quigley's sentence.

In April 2003, the district court held a sentencing hearing for Quigley. At the hearing, the district court questioned the probation officer, the prosecutor, and defense counsel concerning whether the court should add a role enhancement to Quigley's offense level, in view of the court's "recollection of the facts in this case from pleas and from two trials that the defendant was probably—I am not making a finding at this point, an organizer or leader of this entire scheme." The probation officer said that he did not believe that a role enhancement for Quigley was appropriate, and that instead he had enhanced her sentence two levels for more-than-minimal planning. When asked to address the role enhance-

ment possibility, the prosecutor said that, at the time the plea agreement was struck between the government and Quigley, it was not clear that she was involved in the sales contracts for all forty-two properties they knew of at the time. The prosecutor requested that the court reduce Quigley's sentence three levels, to a total offense level of 12, in view of her extensive cooperation. Defense counsel, when asked to respond, requested a two-week continuance, which the district court granted. Counsel filed a brief memorandum objecting to applying a § 3B1.1(a) role enhancement to Quigley.

On May 8, the district court held a second sentencing hearing for Quigley. The court questioned the government about Quigley's role in the conspiracy:

> THE COURT: Based on the government's knowledge and investigation and intensive prosecution of the entire conspiracy, what is the government's understanding of the role that Miss Quigley played?

The government responded by noting that the original plea agreement had not included a role enhancement, and by saying that there was testimony from the trial of one of Quigley's co-conspirators, the Golden trial, from one Timothy Blackburn that Quigley had recruited him to buy real estate. This factual assertion was erroneous, according to the government's brief. The court then asked the government:

> THE COURT: And is it not correct that in the Golden trial there was extensive testimony about Ms. Quigley calling Mr. Golden to make arrangements for the false appraisals and to pay him money for those appraisals?
>
> MS. CHEATHAM: Yes.
>
> THE COURT: My memory may not be right about this but over the many proceedings we've had in these cases, ranging from statuses to guilty pleas to sentencing, et cetera, I certainly came away with the impression–maybe it was wrong–that Miss Quigley was indeed the brains and the organizer behind this very complex conspiracy. Is that the Government's view or not?

MS. CHEATHAM: Answering just regarding the facts and not the legal consequences of the facts, I think the answer is yes, partly because the real estate agent often does that in either a legal or illegal real estate transaction. Often, the real estate agent is the one who has the charisma, has personality, who can draw people from various sources to make a deal happen. Typically that's what we see in real estate agents in general and I think that it would be accurate to say that that's what happened here. And, of course, it's our contention that this was an illegal real estate transaction.

The court also asked the probation officer about whether an "organizer" role enhancement should apply to Quigley:

THE COURT: Had you considered the issue of whether 3(b)1.1 applied?

MS. LUBINSKY: We did, your Honor. I had myself Mr. John Quigley and Daniel Page and when we first got this case we kind of looked at all of those people as independent contractors who kind of did their own thing. Like George Daniel Page fixed up the buildings and that was his thing and it wasn't something that–I mean Miss Quigley may have depended on that but she didn't necessarily supervise or manage him. At the time, we didn't see it that way and I don't know if I necessarily see it that way now, but I do see where the Court can gather that from the facts.

We were just kind of looking at everybody in their own independent—

THE COURT: Well, of course, it isn't just being a manager or supervisor. Subsection (a) uses the term organizer or leader. I would certainly agree with you that based on all the evidence that I've heard and the pleas that I've taken, I don't think the term manager or supervisor applies, no.

The court eventually decided to add the four-level organizer role enhancement to Quigley's sentence, increasing her offense level from 15 to 19:

> I do conclude based on all of my exposure to the facts of this conspiracy–the trials, the pleas, all of which had statements of fact appended to them, the representations by the Government–that Miss Quigley was certainly an organizer or leader of the criminal activity. I think perhaps a more accurate word, which is not a word used in the guideline, is an orchestrator of the activity. I see her as the hub of this conspiracy. There were many spokes to it, from Mr. Golden, who made phony appraisals, to Miss Clark, who I do know and I recognize that Miss Quigley didn't directly deal with, to Mr. Page, who worked on the properties and in some instances found them, but there is no question that Miss Quigley was at the center and the heart of the conspiracy.
>
> . . .
>
> Miss Quigley essentially, with her smarts and her business acumen and her organizational skills, put it all together and made it all work, and that's why I think the four levels under 3(b)1.1 are appropriate in this case.

The court decided to depart downward an additional two levels based on Quigley's assistance to the government, leaving her with a final offense level of 17. That put Quigley in the twenty-four-to-thirty-month guideline range. The district court sentenced her to twenty-seven months' imprisonment.

This appeal followed.

## II.

The issue in this appeal is whether, giving all "due deference" to the district court's application of the sentencing guidelines to the facts of this case, *see United States v. Wilson*, 240 F.3d 39, 47 (D.C. Cir. 2001), the court nonetheless erred in imposing the sentencing enhancement pursuant to USSG § 3B1.1(a). With all respect to the difficult role of the sentencing court, we hold that it did.

Section 3B1.1, entitled "Aggravating Role," provides:

Based on the defendant's role in the offense, increase the offense level as follows:

(a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

(b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

(c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than that described in (a) or (b), increase by 2 levels.

In addition, Application Note 4 to § 3B1.1 further explicates the meaning of "organizer or leader":

In distinguishing a leadership or organizational rule from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include [1] the exercise of decision making authority, [2] the nature of the participation in the commission of the offense, [3] the recruitment of accomplices, [4] the claimed right to a larger share of the fruits of the crime, [5] the degree of participation in planning or organizing the offense, [6] the nature and scope of the illegal activity, and [7] the degree of control and authority exercised over others.

As her counsel made clear at oral argument, Quigley does not challenge that the conspiracy at issue here involved "five or more participants or was otherwise extensive." Quigley's sole claim is instead that the evidence does not support that she was an "organizer or leader" of that conspiracy.

Quigley argues that the evidence adduced below does not show that she controlled any participant in the scheme. Quigley notes, quite correctly, that the district court found that she did not "manage or supervise" anyone in the conspiracy, thus making her ineligible for a three-level role enhancement under § 3B1.1(b), yet nevertheless concluded that Quigley was an organizer or leader under § 3B1.1(a), and

therefore eligible for an even-higher four-level enhancement. In light of that finding, Quigley says, at most, she "managed" or "controlled" property transactions, rather than people, a less-culpable role that Application Note 2 of the commentary to § 3B1.1 says renders a § 3B1.1(a) role enhancement inappropriate.

The government answers that there is evidence that Quigley did in fact control other members of the conspiracy. The government says that Quigley controlled the property buyers because she recruited them and told them how to trick the FHA into insuring their loans. The government also claims that Quigley controlled the appraisers, as she told them the false appraisal value to employ and solicited them. Moreover, the government continues, Quigley's other conduct satisfied some of the other seven factors identified in Application Note 4. Specifically, the government points to the breadth of the scheme, Quigley's recruitment of buyers and selection of potential properties, and the fact that it is "fair to infer" that Quigley profited more from the scheme than the other participants.

Quigley has the better of this debate. There is simply no evidence that Quigley exercised control over any of the other participants in this scheme. As we have recognized, "[a]ll persons receiving an enhancement [under § 3B1.1] must exercise some control over others." *United States v. Graham*, 162 F.3d 1180, 1185 (D.C. Cir. 1998).

Guideline § 3B1.1 orders conspirators based on their "relative responsibility" for the conspiracy. USSG § 3B1.1 cmt. background. It represents a policy judgment that the more control (that is, responsibility) the offender exercises over the conspirators, the more culpable that offender is, and the greater sentence she deserves. *See Graham*, 162 F.3d at 1185 n.5. As we noted in *Graham*, § 3B1.1 "creates three relevant tiers for conspiracies that are 'extensive': a tier for leaders and organizers, a tier for managers and supervisors, and a tier for everyone else," and that these levels "differ only in degree rather than in kind." *Id.* at 1185. Given that tiered structure, an offender is eligible for a four-level role

enhancement as an organizer or leader under § 3B1.1(a) only if she would also be eligible for a three-level role enhancement as a "manager or supervisor" under § 3B1.1(b).

We read subsection (b) to sweep in lower level managerial and supervisory conduct, and subsection (a) to encompass higher level managerial and supervisory conduct. It stands to reason that one more responsible, that is, higher up in the organization's hierarchy, than a manager or supervisor for a conspiracy would herself have managerial or supervisory authority of some sort. True, not everything organizers or leaders do is manage or supervise; the formulation of grand strategy, for example, is not management or supervision, yet is surely something many organizers or leaders do. That fact, however, only highlights why the guidelines punish organizers and leaders more severely than they do managers and supervisors. We are confident that all organizers or leaders of a conspiracy qualify as managers or supervisors under § 3B1.1(b).

The government's reliance on Application Note 4 actually supports this proposition. That note "governs in cases in which the court must distinguish an organizer or leader from a manager or supervisor." *Graham*, 162 F.3d at 1185 n.5. The wording and structure of Application Note 4 raises a strong implication of a hierarchical relationship between the two roles. The first clause of that application note "distinguish[es] a leadership and organizational role from one of *mere* management or supervision . . . ." (Emphasis added). An application note guiding the distinctions between two levels of enhancement which refers to one as "mere" and recites a list of factors inclusive of degrees of such factors as participation and planning, organizing, controlling, and exercising authority over others, is at the very least strongly suggestive of a hierarchical relationship between the two.

This relationship between subsections (a) and (b) is crucial to this case because, as Quigley's brief stresses, the district court found, and the record supports, Quigley was not even a manager or supervisor within the meaning of § 3B1.1(b). Entirely lacking on the record before us is any evidence that

Quigley had any sort of hierarchically superior relationship with the persons who were purportedly her subordinates. We understand the concept of "control" or "authority," implicit in the notion of "management" or "supervision," to connote some sort of hierarchical relationship, in the sense that an employer is hierarchically superior to his employee. The district court failed, however, to require any proof that Quigley was hierarchically superior to her co-conspirators. Instead, the district court focused its inquiry upon whether Quigley was the "hub" or "orchestrator" of the conspiracy. Because the district court applied the four-level enhancement for organizers and leaders, even though it found the three-level enhancement for managers and supervisors was inapplicable, and because it applied an incorrect legal standard to determine whether the four-level role enhancement applied, the district court erred in adding a four-level role enhancement for organizers and leaders to Quigley's offense level.

### III.

For the reasons expressed above, we reverse the district court's imposition of a four-level organizer role enhancement under § 3B1.1(a), vacate Quigley's sentence, and remand the case to the district court for resentencing.