# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 13, 2007        Decided May 6, 2008

No. 05-3131

UNITED STATES OF AMERICA,
APPELLEE

v.

WILBERT S. BRODIE *A/K/A* KHARII WILSTON
ANTHONY BRODIE,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 02cr00190-01)

*A. J. Kramer*, appointed by the court, argued the cause as *amicus curiae* in support of the appellant.

*Wilbert S. Brodie* was on brief, *pro se*.

*John P. Mannarino*, Assistant United States Attorney, argued the cause for the appellee. *Jeffrey A. Taylor*, United States Attorney, and *Roy W. McLeese III* and *Thomas J. Tourish, Jr.*, Assistant United States Attorneys, were on brief. *Ann K. Simon*, Assistant United States Attorney, entered an appearance.

Before: HENDERSON, GARLAND and BROWN, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: A jury found appellant Wilbert Brodie (Brodie) guilty of conspiracy to make false statements to financial institutions to obtain mortgage loans in violation of 18 U.S.C. § 371 and wire fraud in violation of 18 U.S.C. § 1343. Brodie was sentenced to 57 months' imprisonment and ordered to pay $355,449.70 in restitution. Brodie appeals his conviction on ten grounds in five *pro se* filings. Additionally, the Federal Public Defender (Amicus) filed an amicus brief claiming that the district court committed three errors: (1) sustaining an objection to defense counsel's closing argument; (2) denying Brodie's new trial motion based on an alleged *Brady* violation; and (3) applying a four-point "leader or organizer" enhancement to Brodie's offense level under the United States Sentencing Guidelines (Guidelines or USSG). Amicus also asserts that Brodie's trial counsel provided ineffective assistance of counsel because he failed to request a downward departure based on Brodie's immigration status pursuant to *United States v. Smith*, 27 F.3d 649 (D.C. Cir. 1994). For the reasons set forth below, we affirm Brodie's conviction and sentence.

**I.**

Pursuant to a second superseding grand jury indictment filed on August 12, 2004, Brodie was charged with four counts relating to a mortgage flipping scheme: one count of conspiracy to make false statements to financial institutions to obtain mortgage loans and to use wire transmissions in furtherance of a scheme to defraud and obtain money and property under false pretenses in violation of 18 U.S.C. § 371 and three counts of wire fraud in violation of 18 U.S.C. § 1343. The indictment also sought the forfeiture of $239,970.56 pursuant to 18 U.S.C. § 982(a)(2)(A), which requires "a person convicted of a violation of, or a conspiracy to violate [18 U.S.C. § 1343], affecting a financial institution . . . [to] forfeit to the United

States any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation." 18 U.S.C. § 982(a)(2)(A).[1] Two other participants in the scheme, Olurotimi Padonu (Padonu) and Sarafa Kareem (Kareem), were charged with the same four counts as Brodie as well as an additional conspiracy count based on a separate fraud.

## A. *Overview of the Scheme*

Brodie was the president, CEO and only employee of a shell company named Inter Communication Network (ICN). The charged scheme involved ICN's purchase of dilapidated real estate properties—the second superseding indictment focused on eight properties purchased between December 1995 and June 1997—and the subsequent resale of the properties to Brodie at inflated values.[2] Brodie simultaneously applied for a loan based on the inflated resale price, using a portion of the loan to cover ICN's initial purchase of the property at the lower value and keeping the remaining funds for himself. For example, on July

---

[1]Brodie waived his right to a jury trial on the forfeiture count.

[2]The eight properties were 4026 36th Street (36th Street property), 106 15th Street (15th Street property), 3965 Martin Luther King Jr. Ave. (MLK property), 312 R. Street ( R Street property), 127 16th Street (16th Street property), 811 7th Street (7th Street property), 26 Bates Street (Bates Street property) and 1518 5th Street (5th Street property). At trial, the Government also introduced evidence regarding ICN's purchase and resale to Brodie of a ninth property located at 112 18th Street (18th Street property) pursuant to Federal Rule of Evidence 404(b). *See* Fed. R. Evid. 404(b) ("Evidence of other crimes, wrongs, or acts . . . may . . . be admissible . . . as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . ."). ICN was the initial purchaser of all of the properties except the 36th Street property, which was purchased by Dorothy Wallace, the mother of Brodie's child.

10, 1996, ICN purchased a house for $45,000 (the 15th Street property) and resold it to Brodie for $125,000 on the same day. Brodie obtained a personal loan based on the inflated resale price, using part of the loan to cover ICN's $45,000 purchase price and keeping the remainder of the loan proceeds for himself. Over the course of the scheme, Brodie obtained loans totaling $867,500.

To obtain a loan based on the inflated resale price, Brodie had to provide a false appraisal and other documentation to the mortgage lender—Brodie therefore recruited the assistance of several co-conspirators. Esther Stroy-Harper (Harper), a licensed real estate appraiser in Maryland and Washington, D.C., provided a false appraisal for each of the nine properties at Brodie's direction. Harper testified at trial that, although an appraiser is hired by the seller and should not meet with the buyer, she met with Brodie before appraising each property. Harper stated that Brodie directed her to make an inflated appraisal so that Brodie could obtain a loan at the higher value. For example, Harper testified that Brodie paid her $300 to appraise a property (the 6th Street property) at $125,000 even though the property was not worth more than $55,000. Harper justified each inflated appraisal by comparing the subject property to other properties in "neighborhoods that were better and higher in value." Trial Tr. 378, Jan. 12, 2005. Harper also testified that Brodie asked her to omit from the appraisals the original contract price on ICN's purchase of the property and the fact that several of the properties had been sold to ICN at foreclosure and at one-half of the value of her appraisal.

Mortgage brokers Padonu and Kareem, who pleaded guilty, assisted Brodie by preparing false mortgage applications and submitting the applications to mortgage lenders at Brodie's direction. Additionally, George Akinmurele, a CPA, prepared false tax documentation for Brodie's mortgage loan applications.

Bank records show that Brodie paid Padonu and Akinmurele for their services.

## B. *Trial*

The jury trial began on January 10, 2005. FBI Special Agent Christine Taylor testified, summarizing the transactions relating to the eight properties charged in the scheme.[3] Taylor explained that ICN initially purchased seven of the eight properties and promptly resold them to Brodie at higher values.

Bill Brewster, an underwriting expert at the Federal National Mortgage Association (Fannie Mae), testified as an expert witness for the Government regarding loan underwriting and underwriting guidelines. Brewster described the loan application and approval process in general and described how a false appraisal is used to inflate the value of a loan. In particular, Brewster testified that a loan amount is based on an independent appraisal of the property and the sales price. He further explained that the lender relies in part on the sales history of a property because any significant change in value can indicate that the property is inflated in value. Brewster noted that a lender would not know if ICN's original purchase of the property took place on the same day as the resale to Brodie and the issuance of the loan unless the appraiser disclosed this information to the lender. Brewster also stated that a lender would not make a loan if it discovered that the loan was being used to pay for the seller's (ICN's) original purchase of the property.

Six real estate brokers and appraisers who had participated in transactions involving the various properties testified about the values of the properties, the sale of the properties to the shell

---

[3]Taylor's testimony was based on loan files, property settlement files and bank files which the Government introduced into evidence without objection.

company and Brodie's involvement with the sales. Harold Huggins appraised the 15th Street property on July 28, 1995 at $39,000. ICN bought the property one year later for $45,000 and sold it to Brodie on the same day for $125,000. Robert Casper (Casper), a real estate agent and former appraiser specializing in bank foreclosures, valued the same property in 1999 at $64,000. Casper also appraised the 5th Street property on September 12, 1996 at $48,000—ICN purchased the property on April 29, 1997 for $56,000 and resold it to Brodie for $130,000 less than six months later. Casper further testified that several of the appraisals Brodie used to obtain loans were inflated. For example, an appraisal of the 5th Street property done on July 3, 1997 estimated the value of the property at $132,000. Casper explained that even if the property had been renovated after ICN's April 1997 purchase for $56,000—which it was not—it would not be worth even $90,000.

Larry Gardner (Gardner) created a "broker's price opinion" for the sale of the 7th Street property which ICN purchased on May 2, 1997. Gardner estimated the value of the property at $60-65,000 and ICN purchased the property for $69,000. On the same day, ICN resold the property to Brodie for $162,000. At trial, Gardner reviewed a February 7, 1997 report that appraised the property at $160,000. Gardner testified that the property was not worth one-half of that estimate and noted that the report also falsely stated that the property included a full basement with a half-bath and a recreation room.

Gary Wing (Wing), who was the listing agent for the 18th Street property, attended the settlement at which the property was sold to ICN for $47,000 on November 19, 1996. Wing testified that the property was not worth even half of the $121,000 Brodie paid for it one month later. Charles Nucciarone (Nucciarone) marketed and managed foreclosed properties, including the 18th Street property, and testified that it was not worth the $121,000 purchase price Brodie paid (due

to extensive water damage) and thus appraised it at only $60-65,000.

Daniel Elias (Elias) inspected the R Street property and attended the November 13, 1996 settlement at which ICN purchased it for $60,000. Elias testified that the house was uninhabitable at the time; nonetheless ICN resold it to Brodie on the same day for $130,000. Elias was also the selling agent for the Bates Street and MLK properties. ICN purchased the Bates Street property—which, according to Elias, was also uninhabitable—for $65,000 and resold it to Brodie for $140,000 two days later. ICN purchased the MLK property for $25,000 on November 1, 2006 and sold it to Brodie for $98,000 six days later. Special Agent Taylor testified that the remaining two properties, 36th Street and 16th Street, were similarly purchased by ICN and resold to Brodie. The 36th Street property was sold to Dorothy Wallace for $46,000 on December 27, 1995 and resold to Brodie for $110,000 on the same day; the 16th Street property was sold for $48,500 and resold for $125,000 on November 20, 1996.

As noted, Harper testified that, at Brodie's direction, she prepared inflated appraisals for each of the properties involved in the scheme. Harper admitted on cross-examination that she had prepared hundreds of false appraisals apart from her work with Brodie. Harper also admitted that she had been fired from a previous job with a mortgage broker due to a discrepancy in "[a]n appraisal that someone else did for a loan that [she] was doing." Trial Tr. 465-66, Jan. 12, 2005. Harper further testified that she had entered into a plea agreement with the government in 2002 which required her to testify against Brodie. Harper acknowledged that in exchange for her plea and cooperation, the Government agreed not to prosecute her sister for the purchase of two properties implicated in a different mortgage fraud scheme.

The Government also presented witnesses who testified about the title searches on the nine properties and the issuance of loans to Brodie. James Hafey and Keith Smith, employees of title companies, testified that they received title search requests by fax sent by Brodie for three properties he purchased: the 7th Street property on April 24, 1997, the Bates Street property on May 27, 1997 and the 5th Street property on June 24, 1997. Loan officers of the companies that serviced Brodie's loans testified that they issued the loans without knowing that the same properties Brodie purchased had been recently sold to ICN for half the price paid by Brodie.

The Government concluded its case-in-chief with the testimony of Sandra Henderson, an auditor, who reviewed all of the bank records, settlement statements, contracts and other documents involved in the case. Henderson testified that the funds ICN received from its sale of the properties to Brodie were in turn used to pay for ICN's earlier purchase of the property. Henderson also testified that other money ICN received from Brodie was used to make Brodie's mortgage payments and to pay Brodie's credit card and utility bills and other personal expenses.

Brodie neither testified nor called any witnesses in his defense and his counsel did not move for acquittal at the close of evidence. Brodie's closing argument focused on Harper's credibility. For example, defense counsel argued that Harper had pleaded guilty to participation in a mortgage fraud distinct from Brodie's alleged fraud. Although Harper's separate fraud resulted in $1.3 million in losses, defense counsel highlighted that Harper was required to pay only $50 per month in restitution in exchange for her cooperation in prosecuting Brodie. He also argued that Harper met with the Government over thirty times and was "trained on what to say." Trial Tr. 715, Jan. 14, 2005. Defense counsel then questioned Harper's

testimony that she had first alerted investigators to Brodie in 2001:

> If she first brought Brodie's name up in November of 2001, why are we in 2005 trying this case? What evidence did the government show you that she mentioned Brodie's name in November, 2001 when she first met with investigators? He is an experienced prosecutor, he is knowledgeable. He has put in 900 exhibits. What single document do you have to support her conclusion that she . . . mentioned Mr. Brodie's name when she first met with someone? Because it didn't happen.

*Id.* at 716.

The Government objected. At the bench conference the trial judge stated:

> [Brodie] was indicted a long time ago, [and] it was because of him that it didn't go to trial. You are barking up the wrong tree. And her testimony is uncontested that she mentioned it in '01. An[d] the reason for why this case did not get to trial. What do you think you are doing? . . . You are opening up the whole thing. You want the jury to know that he changed lawyers four times? . . . [T]here [was] a whole series of indictments before . . . he was indicted by himself [in] '02. I have to tell [the jury] to ignore this argument. . . . [T]he testimony before them is she said it in '01. You have nothing to contradict that. Certainly you can't base it on the fact that it has taken us until '04 to try this case.

*Id.* at 716-718. The court then charged the jury:

> The argument about whether or not [Harper] said what she said in '01 and how long it has taken to get this case to trial, it is stricken. It is of no interest to you. How

> long this case has taken and what the reasons are and you should not for a moment try to think about why it has taken a while to get this case to trial. It is of absolutely no relevance to you and the only evidence you have before you is that she said that she mentioned his name in November '01.

*Id.* at 718. Following the instruction, defense counsel continued to question Harper's credibility, arguing that she was "a person that has lied over and over and over and over again." *Id.* at 719.

On January 18, 2005, the jury convicted Brodie on all four counts.

### C. *Post-Trial Proceedings*

Seven days after Brodie's conviction, the trial prosecutor wrote defense counsel, stating in part:

> This afternoon, I was told that in March 2004, the FBI received an initial report from a lender regarding a bogus mortgage loan application on behalf of Ms. Esther Harper's niece. The paperwork, which was submitted to the lender in September, 2001, predates Ms. Harper's cooperation with the government. The loan application identifies Ms. Harper as the interviewing loan officer and contains some false statements regarding the niece's employment. I have no information that Ms. Harper is aware of the FBI's receipt of the above-mentioned report.

Letter from Jonathan N. Rosen, Assistant United States Attorney, to Bruce A. Johnson, Jr., Defense Counsel (Jan. 25, 2005).

Brodie moved for a new trial on the ground that this newly discovered evidence "would have been used by [Brodie] to impeach the credibility of Ms. Harper." Mot. for New Trial, Feb. 4, 2005, at ¶ 1. The district court denied the motion,

concluding that any impeachment based on the post-trial information would have been "merely cumulative" and "would not have affected the 'fairness of the trial the defendant actually received'" because Harper "was impeached at trial based on acts involving substantially the same type of conduct." Order Denying Mot. for New Trial, Apr. 7, 2005, at 1 (quoting *United States v. Smith*, 77 F.3d 511, 514 (D.C. Cir. 1996)). The court explained that "[h]aving been present for the wealth of testimonial and documentary evidence that the government introduced at trial, the Court can conclude, without hesitation, that this new evidence would not have had any effect on the jury's ultimate verdict, and that, even without Harper's testimony, the government's evidence was more than sufficient to sustain a conviction." *Id.* at 6. Moreover, the district court denied the motion because "there is no evidence that 'a new trial would *probably* produce an acquittal.'" *Id.* at 1 (quoting *United States v. Williams*, 233 F.3d 592, 593 (D.C. Cir. 2000)) (emphasis in original) (internal quotations omitted).

Brodie was sentenced on August 4, 2005. The Government sought a four-level enhancement on the ground that Brodie was "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). The district court imposed the four-level enhancement under U.S.S.G. § 3B1.1, declaring that "[t]he evidence is clear that the defendant . . . was the organizer and/or leader of a criminal activity that involved five or more participants." Sentencing Tr. 25, Aug. 4, 2005. It explained that the five participants included Brodie, "Mr. Padonu [and] Mr. Kareem who were co-conspirators who pled out," "Ms. Harper [who] testified she was paid by the defendant and asked by him to provide false appraisals, and [who] testified to her own culpability in this conspiracy" and "Mr. Akinmurle [sic] [who] was paid and provided false documentation regarding tax documents." *Id.* The court held in the alternative that "this was also an extensive criminal activity within the meaning of 3B1.1"

because "[e]ight properties were involved [over] some eighteen months." *Id.* at 26. The court further noted that it was applying "the Guideline range, although this is a case that [the court] would be tempted to exceed the guideline range, but [the court] did not give you notice." *Id.* at 37.

At sentencing, defense counsel did not request a downward departure based on Brodie's immigrant status under *United States v. Smith*, 27 F.3d 649 (D.C. Cir. 1994).[4] The court sentenced Brodie to concurrent 57 months' imprisonment on each of the conspiracy and wire fraud counts and ordered Brodie to pay $355,449.70 in restitution pursuant to 18 U.S.C. § 982(a)(2)(A). Brodie filed a timely appeal on August 10, 2005.[5]

## II.

We address separately Brodie's closing argument, new trial motion, sentencing, ineffective assistance of counsel and *pro se* claims.

### A. *Closing Argument*

During closing argument, defense counsel argued that Harper was not credible because she testified that she had first mentioned Brodie's name to FBI investigators in 2001 yet Brodie did not go to trial until 2005. Amicus claims that the district court erred in sustaining the Government's objection to this argument. We review for abuse of discretion. *See United*

[4]Brodie is a Jamaican national and a legal permanent resident of the United States.

[5]Two weeks later, Brodie's trial counsel informed the Court that he was withdrawing from further representing Brodie. We subsequently appointed the Federal Public Defender to act as amicus curiae to present arguments on Brodie's behalf. Order Denying Appellant's Second Mot. for Release Pending Appeal, Jan. 24, 2006.

*States v. Hoffman*, 964 F.2d 21, 24 (D.C. Cir. 1992) (per curiam).

Defense counsel is permitted to argue "all reasonable inferences from the facts in the record." *Id.* (citing *United States v. DeLoach*, 504 F.2d 185, 190 (D.C. Cir. 1974)). Brodie's claim that the five-year span from investigation to trial impugned Harper's veracity, however, "moved from arguing fair inferences from the record to arguing the existence of facts *not* in the record." *Id.* at 25 (emphasis in original). Not only was there no record evidence connecting the delay to Harper's credibility but the record in fact indicated that Brodie himself caused the delay by changing counsel four times. As the district court noted, defense counsel risked prejudicing his client by drawing attention to the delay. Trial Tr. 716-17, Jan. 14, 2005 ("What do you think you are doing? . . . You are opening up the whole thing. You want the jury to know that he changed lawyers four times?"). A trial court "has 'broad discretion in controlling the scope of closing argument,' and an abuse of that discretion will be found only where the effect of the trial court's ruling is to 'prevent[ ] defense counsel from making a point essential to the defense.'" *Hoffman*, 964 F.2d at 24 (quoting *United States v. Sawyer*, 443 F.2d 712, 713 (D.C. Cir. 1971)) (alteration in *Hoffman*). The district court did not abuse its discretion in refusing to permit an argument that misinterpreted the evidence, was unrelated to Harper's credibility and risked prejudicing the defendant. *See Sawyer*, 443 F.2d at 714 (district court properly excluded "statements that misrepresent the evidence or the law, introduce irrelevant prejudicial matters, or otherwise tend to confuse the jury") (footnotes omitted).

Amicus further argues that the court's jury instruction that "the only evidence you have before you is that [Harper] said that she mentioned [Brodie's] name in November '01" constituted an improper vouching for Harper's credibility. Trial Tr. 718, Jan.

14, 2005.  The statement did not endorse Harper's credibility, however, when viewed in the context of the entire instruction:

> The argument about whether or not [Harper] said what she said in November '01 and how long it has taken to get this case to trial, it is stricken.  It is of no interest to you.  How long this case has taken and what the reasons are and you should not for a moment try to think about why it has taken a while to get this case to trial.  It is of absolutely no relevance to you and the only evidence you have before you is that she said that she mentioned his name in November '01.

*Id.*

The statement *in toto* instructed the jury to ignore both the length of time the case took to proceed to trial and the reason for the delay.  "[T]he only evidence you have before you" thus referred simply to the fact that Harper said she had mentioned Brodie's name in 2001 and not to Harper's credibility.  Moreover, defense counsel extensively questioned Harper's credibility *after* the instruction.  *See id.* at 718-21.  Accordingly, the district court's instruction, taken in context, did not imply that Harper's testimony was credible and thus was not an abuse of discretion.  *See United States v. Schwartz*, 924 F.2d 410, 424 (2d Cir. 1991) ("Having reviewed the comments of which appellants complain *in context*, we do not think [the judge's] comments vouched for [the witness's] credibility or were in any event prejudicial to defendants.") (emphasis added).

### B. *New Trial Motion*

Amicus argues that the district court erred in refusing to grant a new trial based on the Government's alleged *Brady*

violation.[6] While we generally review the district court's denial of a new trial motion for abuse of discretion, the denial of a new trial motion based on a *Brady* claim is "something of a special situation." *United States v. Oruche*, 484 F.3d 590, 595 (D.C. Cir. 2007). Under the abuse of discretion standard, we defer to the district court's findings of fact but "once the existence and content of undisclosed evidence has been established, the assessment of the materiality of this evidence under *Brady* is a question of law." *Id.* "[O]nce a court finds a *Brady* violation, a new trial follows as the prescribed remedy, not as a matter of discretion." *Id.*

"There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). As noted earlier, the prosecutor failed to disclose (until seven days after trial) that in 2004 the FBI had learned that Harper had been involved in a fraudulent loan application on behalf of her niece in 2001. While the Government does not contest that the information was favorable to Brodie as impeachment evidence or that it was not disclosed until after trial, the Government does maintain that Brodie was not prejudiced by the non-disclosure.

"To satisfy the prejudice component, the withheld evidence must be 'material;' that is, there must be 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *United*

---

[6]The holding in *Brady v. Maryland*, 373 U.S. 83 (1963), "requires the government to disclose, upon request, material evidence favorable to a criminal defendant, including evidence held by law enforcement officials." *United States v. Oruche*, 484 F.3d 590, 596 (D.C. Cir. 2007) (citing *Brady*, 373 U.S. at 87).

*States v. Johnson*, 519 F.3d 478, 488 (D.C. Cir. 2008) (quoting *Strickler*, 527 U.S. at 280 (quoting *United States v. Bagley*, 473 U.S. 467, 676 (1985))). Amicus claims that the withheld evidence was material because it would have assisted in the impeachment of Harper. The Government counters that the impeachment evidence was cumulative and cumulative impeachment evidence is not material. *See, e.g.*, *Oruche*, 484 F.3d at 599-600 (failure to disclose grand jury transcript of witness's admission to lying in another case was not *Brady* violation because witness was "thoroughly impeached" at trial when cross-examined about prior convictions, past incidents of lying and benefits received in exchange for testimony); *United States v. Maloney*, 71 F.3d 645, 653 (7th Cir. 1995) (impeachment evidence that lawyer witness instructed client to lie was cumulative because witness admitted to taking statements from other clients with full knowledge of falsity); *United States v. Kozinski*, 16 F.3d 795, 818 (7th Cir. 1994) (evidence that witness participated in two additional drug sales was cumulative where witness admitted to being drug dealer); *United States v. Marashi*, 913 F.2d 724, 732-33 (9th Cir. 1990) (witness's false statement was cumulative where her trial testimony was contradicted by another prior statement). As the district court noted, Harper was thoroughly impeached at trial. Order Denying Mot. for New Trial at 5 ("[T]he jury was well aware of Harper's legacy of past untruths . . . ."). For example, Harper admitted on cross-examination that she had prepared hundreds of false appraisals apart from her work for Brodie and that she had been fired from a previous job with a mortgage broker due to a discrepancy in "[a]n appraisal that someone else did for a loan that I was doing." Trial Tr. 465-66, Jan. 12, 2005. Defense counsel also questioned Harper's motivation to testify truthfully by highlighting the reduced sentence she was likely to receive for testifying against Brodie.

To be cumulative, however, undisclosed impeachment evidence must be "the same kind of evidence" as that introduced

at trial. *United States v. Cuffie*, 80 F.3d 514, 518 (D.C. Cir. 1996). In *Cuffie* a co-defendant, who pleaded guilty and testified, was impeached at trial by evidence "that he was a cocaine addict; that he was a cooperating witness; that, as the owner of the apartment, he had an incentive to place responsibility for the drugs on someone else; and that he had violated his oath as a police officer to uphold the law." *Id.* The Government failed to disclose that the witness had lied under oath in an earlier court proceeding involving the same conspiracy. *Id.* We held that the witness's testimony was "almost unique in its detrimental effect on [his] credibility" and therefore ordered a new trial. *Id.*

Amicus similarly asserts that the undisclosed report was not "the same kind of evidence" and thus was not cumulative. *Cuffie*, 80 F.3d at 518. Specifically, Amicus contends that the report was unique because it revealed that Harper engaged in fraud as a loan officer whereas the other impeachment evidence involved fraud as an appraiser. We do not agree—Harper's admission that she prepared loan applications containing false statements for Brodie *is* similar to her previous admissions that she had prepared hundreds of appraisals containing false statements. The withheld evidence was simply another illustration of Harper's untruthfulness rather than evidence "almost unique in its detrimental effect" on Harper's credibility. *Id.* This case thus differs from *Cuffie*, where the Government withheld the fact that a critical witness—a co-defendant who had pleaded guilty—perjured himself in a previous court proceeding involving the same conspiracy and there was no other impeachment evidence that he had testified untruthfully in the past. Accordingly, we conclude that the withheld report was merely cumulative of other impeachment evidence and therefore the district court properly denied Brodie's new trial motion.

## C. *Brodie's Enhanced Sentence*

Amicus claims that the district court improperly applied a four-level sentencing enhancement pursuant to U.S.S.G. § 3B1.1. Section 3B1.1 of the Guidelines provides that the defendant's offense level should be increased by four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). Amicus argues that there was no evidence that Brodie was an "organizer or leader" or that there were at least five participants in the scheme. We review the district court's factual findings supporting a section 3B1.1 enhancement under the "clearly erroneous" standard of review.[7] *See United States v. Shah*, 453 F.3d 520, 524 (D.C. Cir. 2006); *United State v. Yeh*, 278 F.3d 9, 14 (D.C. Cir. 2002).

### 1. *Organizer or Leader*

Amicus claims that Brodie did not exercise control over any of the other participants in the scheme and therefore Brodie was not "an organizer or leader of a criminal activity." Amicus notes that all of the other participants had been involved in similar fraudulent conduct before their participation in Brodie's scheme and "it is far more likely that Padonu and/or Kareem supervised defendant and told him how to complete the process, as one of them was the loan officer on all nine of the properties with which defendant was involved." Amicus Br. 39. Amicus contends that Brodie's involvement is similar to that of the defendant in *United States v. Quigley*, 373 F.3d 133 (D.C. Cir. 2004), where the court held that a real estate agent involved in a "flipping" scheme was not "an organizer or leader."

---

[7]Although Brodie objected to the district court's "five participants" finding at sentencing, he did not object to the "organizer or leader" finding. We need not reach whether that finding is reviewed for plain error only, however, because we conclude that the enhancement was not erroneous.

While plainly control is one factor in determining whether someone qualifies as an "organizer or leader," the Guidelines include several other factors, including "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime [and] the degree of participation in planning or organizing the offense." U.S.S.G. § 3B1.1, cmt. n.4. The record contains evidence supporting each of these factors.

First, Brodie recruited individuals with specialized skills to facilitate his scheme: Akinmurele prepared false financial documents, Harper appraised the properties and Padonu or Kareem submitted the false loan applications. Second, Brodie coordinated the group's efforts and directed them in the performance of their respective tasks. For example, Brodie met with Harper and directed her to appraise the properties at specific inflated prices. Similarly, Brodie directed Akinmurele to prepare false documents to conform with information Brodie had already submitted to the lender. Brodie also directed Padonu and Kareem to file the false loan applications. Finally, Brodie paid the other participants flat fees for their services—several hundred dollars each—and kept the "fruits of the crime" (the loan proceeds) for himself. Accordingly, the record supports the finding that Brodie was an organizer or leader of the criminal activity. *See United States v. Wilson*, 240 F.3d 39, 46-47 (D.C. Cir. 2001) (affirming imposition of enhancement because "[t]he exercise of decision making authority, recruitment, and a claimed right to a larger share of the proceeds are prominent among the factors that the commentary to the Guidelines indicates should be considered"); *United States v. Kelley*, 36 F.3d 1118, 1129 (D.C. Cir. 1994) (defendant exercised control over others as "organizer or leader" by instructing other participants to take specific actions).

The holding in *Quigley* does not compel a different result. Quigley was a real estate agent who pleaded guilty to conspiracy to defraud the United States for her role in a house-flipping scheme. 373 F.3d at 134-35. She aided the scheme by helping her co-conspirators find appraisers to inflate the property values and by helping buyers obtain false income records so that they qualified for federally insured mortgages. *Id.* at 134. The court held that a four-level "organizer or leader" enhancement was not warranted because "[e]ntirely lacking on the record before us is any evidence that Quigley had any sort of hierarchically superior relationship with the persons who were purportedly her subordinates." *Id.* at 140. While Quigley assisted *others* to engage in a fraud, Brodie recruited and organized his co-conspirators so that *he* could purchase the properties and retain the fruits of the fraud. Brodie occupied the top position in the conspiracy hierarchy, directing and supervising the efforts of an appraiser, two loan officers and an accountant. *Quigley* was simply a facilitator but Brodie designed and led the conspiracy. Accordingly, the district court did not err in finding that Brodie was an "organizer or leader."

### 2. *Five Participants or Otherwise Extensive*

While Amicus does not contest that Padonu, Kareem and Harper were participants in the fraudulent scheme, Amicus does assert that Akinmurele cannot be characterized as a criminally responsible participant because "there is no indication that he had any knowledge of the 'flipping' scheme." Amicus Br. 40. Accordingly, Amicus contends that the record does not support the finding that Brodie was the leader of a scheme involving five participants.

The comment to section 3B1.1 defines a participant as "a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1 cmt. n. 1. A person is "'criminally responsible' under § 3B1.1 only if 'he commit[s] all of the elements of a statutory crime

*with the requisite mens rea.*'" *United States v. McCoy*, 242 F.3d 399, 410 (D.C. Cir. 2001) (quoting *United States v. Bapack*, 129 F.3d 1320, 1325 (D.C. Cir. 1997) (internal quotations omitted)) (emphasis added and alteration in *McCoy*). The person need not be "found criminally responsible as a principal or culpable in the same crime of which the supervising defendant was convicted: '[J]ust as a party who knowingly assists a criminal enterprise is criminally responsible under principles of accessory liability, a party who gives knowing aid in some part of the criminal enterprise is a "criminally responsible party" under the Guidelines.'" *Bapack*, 129 F.3d at 1325 (quoting *United States v. Hall*, 101 F.3d 1174, 1178 (7th Cir. 1996)) (alteration in *Bapack*).

Based on the record, the district court's finding that Akinmurele was a criminally responsible person was not clearly erroneous. Akinmurele admitted to the FBI that he prepared false financial statements for Brodie at Brodie's direction and bank records corroborate Akinmurele by indicating that Brodie paid Akinmurele for his services. Therefore, the imposition of the four-level enhancement pursuant to U.S.S.G. § 3B1.1 was not clearly erroneous.

### D. *Failure to Request Downward Departure*

Amicus claims that Brodie's trial counsel provided ineffective assistance because he did not request a downward departure based on Brodie's immigration status pursuant to *United States v. Smith*, 27 F.3d 649 (D.C. Cir. 1994). To demonstrate that "counsel's assistance was so defective as to require reversal of a conviction . . . the defendant must [first] show that counsel's performance was deficient." *Strickland v. Washington*, 466 U.S. 668, 687 (1984) "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* While we often remand an ineffectiveness claim for an evidentiary hearing, *see United States v. Geraldo*, 271 F.3d 1112, 1116 (D.C. Cir. 2001), we dispose of such a claim

"when the trial record conclusively shows that the defendant is entitled to no relief; and when the trial record conclusively shows the contrary." *Id.*

In *Smith*, "we allowed [a] downward departure because of a defendant's status as a deportable alien, recognizing that because such aliens were ineligible for spending the last 10% of their sentences in community-based confinement and could not be assigned to minimum security prisons . . . a defendant's deportable alien status would 'substantial[ly] . . . affect the severity of his confinement.'" *United States v. Graham*, 83 F.3d 1466, 1481 (D.C. Cir. 1996) (quoting *Smith*, 27 F.3d at 655). While recognizing that the district court was not required to grant a *Smith* departure, Amicus argues that "there is no conceivable tactical reason for a defendant not to request one" and that "there is at least a 'reasonable probability' that the district court would have granted a *Smith* departure." Amicus Br. 42, 44.

Assuming *arguendo* that trial counsel was deficient in failing to request a *Smith* departure,[8] Amicus cannot demonstrate that the deficiency prejudiced Brodie because the district court made clear that it would not have departed downward. *See* Sentencing Tr. 37, Aug. 8, 2005 ("I will apply the Guideline range, although this is a case that I would be tempted to *exceed* the guideline range, but I did not give you notice.") (emphasis added). Accordingly, we conclude that Brodie is not entitled to relief based on his ineffectiveness claim. *See Strickland*, 466 U.S. at 687 (To demonstrate that "counsel's assistance was so defective as to require reversal of a conviction . . . the defendant must show that the deficient performance prejudiced the defense.").

---

[8]We note, however, that Amicus conceded at oral argument that "there may be cases where tactically or strategically the lawyer doesn't ask for [a *Smith* departure]." Oral Argument 41:02-06, Nov. 13, 2007.

E. *Pro Se Claims*

In addition to raising some of the arguments addressed above, Brodie raises ten additional arguments in his five *pro se* filings.

1. *Sufficiency of the Evidence*

Brodie first argues that his conviction should be reversed for insufficient evidence. Viewing the evidence in the light most favorable to the government, we must accept "the jury's guilty verdict if we conclude that 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Dykes*, 406 F.3d 717, 721 (D.C. Cir. 2005) (quoting *United States v. Arrington*, 309 F.3d 40, 48 (D.C. Cir. 2002)). While this articulation imposes an "'exceedingly heavy burden,'" Brodie's burden is "even heavier" because he failed to move for a judgment of acquittal and we thus consider his claim only if denial on the waiver ground would constitute a "'manifest miscarriage of justice.'" *United States v. Booker*, 436 F.3d 238, 241 (D.C. Cir. 2006) (quoting *United States v. Salamanca*, 990 F.2d 629, 637 (D.C. Cir. 1993); *United States v. Thompson*, 279 F.3d 1043, 1051 (D.C. Cir. 2002)).

To be guilty of the charged conspiracy, Brodie had to enter into an agreement to commit fraud, knowingly participate in the conspiracy and commit "'at least one overt act . . . in furtherance of the conspiracy.'" *United States v. Alston-Graves*, 435 F.3d 331, 337 (D.C. Cir. 2006) (quoting *United States v. Mellen*, 393 F.3d 175, 180-81 (D.C. Cir. 2004) (internal quotation omitted)). "The elements of the wire fraud offense [a]re that [Brodie] knowingly and willingly entered into a scheme to defraud and that an interstate wire communication was used to further the scheme." *Id.* Because "the record is not devoid of evidence" supporting each element of both offenses—the documentary evidence alone demonstrates Brodie's extensive involvement in the scheme—no manifest miscarriage of justice results from

rejecting Brodie's sufficiency claim. *Thompson*, 279 F.3d at 1051.

## 2. *Ineffective Assistance of Counsel*

Brodie next asserts that his counsel was ineffective in failing to move for judgment of acquittal. Because the evidence of Brodie's guilt was overwhelming, Brodie was not prejudiced by his counsel's failure to move for a judgment of acquittal. Absent a finding of prejudice, Brodie's ineffectiveness claim fails. *See Strickland*, 466 U.S. at 694.

## 3. *"Expert" Witness Claim*

Brodie also claims that Harper and Brewster were not qualified to testify as expert witnesses. Harper did not testify as an expert witness, however, and Brodie stipulated to Brewster's expert status at trial.

## 4. *Statute of Limitations and Speedy Trial Claim*

Brodie argues that the indictment was untimely under the five-year statute of limitations for non-capital crimes, 18 U.S.C. § 3282(a), and thus violated his speedy trial right under the Sixth Amendment. The statute of limitations for crimes affecting financial institutions is ten years, s*ee* 18 U.S.C. § 3293, and thus the indictment was timely filed.

## 5. *Jurisdiction and Venue*

Brodie asserts that the case was improperly tried in the District of Columbia (District) because the defrauded lenders were located both in the District and in Maryland. "The government bears the burden of establishing by a preponderance of the evidence that venue is proper with respect to each count charged against a defendant." *United States v. Lam Kwong-Wah*, 924 F.2d 298, 301 (D.C. Cir. 1991). Because overt acts in furtherance of the conspiracy took place in the District—seven of the properties are located in the District—venue was proper

on the conspiracy count. *See* 18 U.S.C. § 3237(a) ("Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed."); *Lam Kwong-Wah*, 924 F.2d at 301 ("It is a well-established rule that 'a conspiracy prosecution may be brought in any district in which some overt act in furtherance of the conspiracy was committed by any of the co-conspirators.'" (quoting *United States v. Rosenberg*, 888 F.2d 1406, 1415 (D.C. Cir. 1989))). Venue was proper on the wire fraud count because Brodie faxed title search requests from the District to settlement companies in Maryland. *See* 18 U.S.C. § 3237(a); *United States v. Allen*, 491 F.3d 178, 186 (4th Cir. 2007) ("[O]verwhelming evidence was adduced at trial to support the convictions of [defendants] on wire fraud and aiding and abetting wire fraud" because "there is ample evidence that [defendant] faxed fraudulent documents.").

### 6. *Confrontation Clause Claim*

Brodie contends that his Confrontation Clause right under the Sixth Amendment was violated because documentary evidence was admitted into evidence by agreement of the parties without an opportunity for him to cross-examine witnesses in support thereof. "[E]ven under the more stringent procedural due process standards applicable to criminal proceedings, the courts have held that the right to confront and cross-examine witnesses may be waived." *Ritz v. O'Donnell*, 566 F.2d 731, 735 (D.C. Cir. 1977) (citing *Taylor v. United States*, 414 U.S. 17, 19-20 (1973)). Brodie did so here.

### 7. *Forfeiture Order*

As noted earlier, the district court ordered Brodie to pay $355,449.70 in restitution pursuant to 18 U.S.C. § 982(a)(2)(A). *See* 18 U.S.C. § 982(a)(2)(A) ("[A] person convicted of a

violation of, or a conspiracy to violate [18 U.S.C. § 1343] *affecting a financial institution*, . . . [must] forfeit to the United States any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation.") (emphasis added); 18 U.S.C. § 20(1) (defining "financial institution" as "an insured depository institution (as defined in section 3(c)(2) of the Federal Deposit Insurance Act)"). Brodie claims that the district court's forfeiture order should be reversed because the Government failed to prove that the lenders are institutions insured by the FDIC. The Government, however, introduced affidavits from the FDIC's Assistant Executive Secretary certifying that the lenders are FDIC-insured. Brodie also contends that forfeiture was not authorized under section 982 because the lenders resold their mortgage receivables to other financial institutions but the statute does not create such an exception. *See* 18 U.S.C. § 982(a)(2) ("The court, in imposing sentence on a person convicted of a violation of, or a conspiracy to violate [18 U.S.C. § 1343] affecting a financial institution . . . *shall* order that the person forfeit to the United States *any property* constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation.") (emphases added).

## 8. *Miscellaneous Arguments*

Brodie makes the following arguments in passing: (1) the indictment was "duplicitous," (2) the jury instructions were "confusing" and (3) his enhanced sentence was unconstitutional under *United States v. Booker*, 543 U.S. 220 (2005). Because Brodie makes only conclusionary assertions regarding these arguments, we consider these claims abandoned on appeal. *See United States v. Hall*, 370 F.3d 1204, 1209 n.4 (D.C. Cir. 2004)

("[O]ne sentence, unaccompanied by argument or any citation to authority, does not preserve the issue for decision.").[9]

For the foregoing reasons, we affirm the judgment of the district court.

*So ordered.*

---

[9]Moreover, on the merits we reject Brodie's arguments because the indictment was not duplicative, Brodie does not point to any jury instruction that was confusing and his enhanced sentence was not unconstitutional under *Booker* because the court did not treat the Guidelines as mandatory, *see* 543 U.S. at 249-59.