# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued February 9, 2023          Decided April 11, 2023

No. 21-3094

UNITED STATES OF AMERICA,
APPELLEE

v.

LAMONT JOHNSON, ALSO KNOWN AS BLACK,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-cr-00112-1)

*Stephen C. Leckar*, appointed by the court, argued the cause and filed the briefs for appellant.

*Katherine M. Kelly*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Chrisellen R. Kolb*, *Nicholas P. Coleman*, and *George P. Eliopoulos,* Assistant U.S. Attorneys.

Before: SRINIVASAN, *Chief Judge*, WILKINS, *Circuit Judge*, and TATEL, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* TATEL.

TATEL, *Senior Circuit Judge*: After a jury convicted Lamont Johnson of drug trafficking and unlawful firearm possession, the district court sentenced him to 420 months imprisonment. Johnson challenges that sentence, arguing that the district court procedurally erred by miscalculating his Sentencing Guidelines range in three ways: overestimating the quantity of phencyclidine ("PCP") he possessed, finding that he made credible threats of violence, and determining that he acted as a manager or supervisor. As explained below, we affirm on the first two points, reverse the role enhancement, and remand for resentencing.

## I.

While investigating drug trafficking and related shootings in southeast D.C., the FBI learned that certain dealers, including Antonio Tabron, obtained PCP through a middleman, Jamar Gage. In turn, Gage and another individual, Antoine Prailow, bought PCP from Appellant Johnson. Wiretap evidence revealed that in 2017, Johnson sold drugs to Gage and discussed with others a major shipment he was expecting from the West Coast. When the shipment arrived, Johnson called his wife, Karen Johnson, arranging to pick up from her apartment a gun, funnels, and gasoline fuel treatment to dilute the PCP. The government then arrested Johnson and discovered an AR-15 and 1.4 kilograms of PCP in the trunk of his car.

A jury convicted Johnson of conspiring to distribute 1 kilogram of a mixture containing 100 grams of PCP; possessing with intent to distribute the same; and possessing a firearm as a felon and in furtherance of a drug trafficking offense. At sentencing, based on the Drug Quantity Table in the U.S. Sentencing Guidelines, the district court found Johnson responsible for 3 to 10 kilograms of PCP and set Johnson's base offense level at 32. U.S.S.G. § 2D1.1(c)(4). The

court also imposed a two-level enhancement for "ma[king] a credible threat to use violence," U.S.S.G. § 2D1.1(b)(2), and a three-level role enhancement for being "a manager or supervisor" in a "criminal activity [that] involved five or more participants or was otherwise extensive," U.S.S.G. § 3B1.1(b). Determining that the Guidelines range for the drug trafficking counts was 324 to 405 months, the district court imposed a mid-range sentence of 360 months. The court imposed mandatory-minimum sentences on the other counts, for a total of 420 months.

Johnson appeals, arguing that the district court procedurally erred by miscalculating the Guidelines range for the drug trafficking counts. Specifically, he argues that he was responsible for less than 3 kilograms of PCP, and that he neither credibly threatened to use violence nor operated as a manager or supervisor.

## II.

Where, as here, the defendant argues that the district court "miscalculat[ed] the Guidelines," we "accept the district court's findings of fact unless they are clearly erroneous and give due deference to the district court's application of the [G]uidelines to the facts." *United States v. Flores*, 995 F.3d 214, 219 (D.C. Cir. 2021) (second alteration in original) (internal quotation marks omitted).

## Drug Quantity

The base offense level for drug crimes depends on "the quantity of drugs involved in the offense." *United States v. Miller*, 890 F.3d 317, 329 (D.C. Cir. 2018) (internal quotation marks omitted). "The district court must determine [drug] weights by a preponderance of the evidence subject to appellate review for clear error." *United States v. Graham*, 162 F.3d

1180, 1182 (D.C. Cir. 1998). As noted, the district court found that Johnson's offense involved 3 to 10 kilograms of PCP, which amounts to a base offense level of 32. This finding was not clearly erroneous. Record evidence demonstrates that Johnson bought a 1-gallon shipment from the West Coast and sold another 24 fluid ounces to Gage. Together, these amounts surpass the 3-kilogram threshold. *See* Supplemental Appendix ("S.A.") 126–27 (unrebutted expert testimony that a gallon of PCP "conservative[ly]" weighs about 2.75 kilograms and 1 fluid ounce weighs about 22 grams).

Johnson's contrary arguments lack merit. Start with the West Coast shipment. Seizing on the district court's use of the plural "gallons," Johnson insists that nothing in the record shows that the offense involved "gallons of PCP." Johnson Br. 17 (internal quotation marks omitted). But when discussing the West Coast shipment specifically, the district court referred to it as a single gallon. Joint Appendix ("J.A.") 847 (Johnson "wanted [Prailow] to deliver the gallon"). And given the evidence of prior sales to Gage, the government had to prove only that the West Coast shipment amounted to one gallon to surpass 3 kilograms. *See* S.A. 126–27. The government's expert testified that PCP shipments from the West Coast are "usually" or "typically" sent in quantities of "at least a gallon" because "[y]ou're taking a lot of risk." J.A. 590. When discussing the shipment, Johnson said that he "had a whole one on there this time," J.A. 664, and in his brief here, he never disputes that the West Coast shipment was a gallon, Johnson Br. 4 (acknowledging he was "seeking a gallon of PCP" and "it arrived in mid-October"). *See also* Oral Arg. Rec. 8:18–8:37 (agreeing he "was seeking a gallon").

Johnson's arguments about the prior sales to Gage fare no better. Johnson claims that their coded communications are "incapable of a responsible reconciliation," Johnson Br. 8, but

the code was hardly enigmatic. The government's expert explained that the speakers simply swapped "16th" and "8th street[s]" for 16 and 8 fluid ounces. S.A. 134–35. Using this code, Johnson agreed to sell Gage 8 fluid ounces on one occasion and at least 16 fluid ounces on a prior occasion. J.A. 649, 654–55.

Because the West Coast shipment and the prior sales together exceeded the 3-kilogram threshold, we are hardly left with a "definite and firm conviction that a mistake has been committed." *See United States v. Borda*, 848 F.3d 1044, 1069–70 (D.C. Cir. 2017) (internal quotation marks omitted).

### Credible Threat

The Guidelines direct the sentencing court to increase the offense level by 2 if the defendant "made a credible threat to use violence." U.S.S.G. § 2D1.1(b)(2). The district court found that Johnson made three such threats. Specifically, it found that he twice threatened "Shorty," who allegedly owed him $2800. J.A. 689 ("Imma strap up, man, and slide up on shorty man."); J.A. 728 ("Shawty gonna make me punch him in the mouth with that gun."). The district court also found that Johnson credibly threatened violence when he warned Karen that she "better not have no n**** in there around my shit! I'm a kill his ass! On my life! Kill his ass!" J.A. 742.

Our court has yet to determine what constitutes a "threat to use violence" for purposes of this Guideline. We need not do so here, however, because Johnson's only argument as to why these statements do not qualify as threats is that he never "intended to use violence." Johnson Br. 55. But a threat is a threat, even if the speaker never intends to carry it out. *See Elonis v. United States*, 575 U.S. 723, 740 (2015) (defendant violates federal fraud statute where he knows "the communication will be viewed as a threat"). Johnson also

insists that if his statements were threats, they were not *credible* threats. Johnson, however, was both armed and had been convicted of several violent crimes, including shooting someone. And as the district court observed, much was at stake: Shorty owed Johnson a substantial debt, and anyone in Karen's apartment would place his contraband in jeopardy. Given this contextual evidence, the district court committed no error by finding that Johnson made a credible threat.

### Manager or Supervisor

The Guidelines direct the sentencing court to increase the offense level by 3 if the defendant "(i) managed or supervised (ii) at least one 'participant' who was criminally responsible for an offense (iii) in a criminal activity that involved five or more participants or was otherwise extensive." *United States v. Vega*, 826 F.3d 514, 539 (D.C. Cir. 2016) (per curiam). A manager or supervisor must "exercise some control over others." *United States v. Bikundi*, 926 F.3d 761, 801 (D.C. Cir. 2019) (internal quotation marks omitted). "We understand the concept of 'control' or 'authority,' implicit in the notion of 'management' or 'supervision,' to connote some sort of hierarchical relationship, in the sense that an employer is hierarchically superior to his employee." *United States v. Quigley*, 373 F.3d 133, 140 (D.C. Cir. 2004). The district court determined that Johnson managed or supervised five people: his wife Karen, three codefendants, and a potential buyer.

Johnson argues that "nothing shows him . . . controlling at least one . . . associate[] with mens rea." Johnson Br. 5. In response, the government focuses on Karen, arguing that Johnson managed or supervised her by "exercising a strong degree of control over [her] regarding his PCP, related paraphernalia, and gun." Government Br. 52. Indeed, as the government emphasizes, he asked Karen to "secure this shit," J.A. 753, because someone might "get the police," J.A. 754,

and she agreed to "put it behind [her] [headboard]," J.A. 756. But this exchange occurred only after an extended dialogue reflecting give-and-take, not hierarchy or control. Karen objected to his coming over, saying, "I don't want to be involved in none of that," J.A. 740, and telling him to "do what you need to do with that girl," meaning his girlfriend, J.A. 746. "[W]hy you bring that stuff here," she complained, warning, "You not gonna do it out of my house." J.A. 747, 752. Johnson acquiesced, asking her instead to "bring [his] gun . . . downstairs" so he could "take [his] shit uptown." J.A. 748. "OK, cool," she responded. *Id.* A few minutes later, Johnson called back, pleading with her, "I'm just like you couldn't hold me down for a couple weeks? . . . The first mother fucking 3,000 I make I'm gone." J.A. 752–53. Only then did Karen relent. "Okay cool. I can give you two weeks." *Id.*

This conversation reveals that Karen was no "underling[]," *see United States v. Olejiya*, 754 F.3d 986, 991 (D.C. Cir. 2014), and that Johnson was no "commander" with "authority to direct" her, *Flores*, 995 F.3d at 221–22. Instead, as the district court acknowledged in another context, Karen was "a very strong person" who "wanted the drugs and guns out of there," but who "was willing to help [her husband] despite her anger and upset." J.A. 859. The evidence of control is particularly weak given the spousal relationship. *See United States v. McGregor*, 11 F.3d 1133, 1139 (2d Cir. 1993) ("One isolated instance of a drug dealer husband asking his wife to assist him in a drug transaction is not the type of situation that section 3B1.1 was designed to reach."); *United States v. Mankiewicz*, 122 F.3d 399, 406 (7th Cir. 1997) (where father assisted son with one large drug sale, concluding "this relationship is [not] the sort of real and direct influence, aimed at furthering the criminal activity, that the enhancement was intended to punish") (internal quotation marks and citation omitted).

Johnson also challenges the district court's determination that he managed or supervised three codefendants and one anonymous buyer. According to the government, Johnson "directed Prailow and Gage in regard to obtaining PCP from Johnson" because Johnson told Prailow where to meet him once and demanded that Gage come alone to their meetings. Government Br. 53–54. But this reveals nothing more than a seller setting the terms of sale. *See United States v. Slade*, 631 F.3d 185, 191 (4th Cir. 2011) (reversing role enhancement for supplier who never "exercised any supervisory responsibility over [those he supplied]").

In imposing the role enhancement, the district court also referenced Tabron and a would-be buyer, but nothing in the record demonstrates Johnson's control over either. Johnson preferred not to interact with Tabron, S.A. 163, and his only known contact with the potential buyer was to warn him against texting in uncoded language, S.A. 99.

Of course we must "give due deference to the district court's application of the [G]uidelines to the facts." *United States v. Kim*, 23 F.3d 513, 517 (D.C. Cir. 1994) (quoting 18 U.S.C. § 3742(e)). But even where, as here, "the district court reached its decision" with "care," we will be "constrained to [dis]agree" if "the facts simply do not support the [district court's] conclusion." *United States v. Tann*, 532 F.3d 868, 875 (D.C. Cir. 2008). This is just such a case.

## III.

We affirm the district court's calculation of the base offense level and its application of the credible-threat enhancement. We reverse the district court's application of the role enhancement and remand for resentencing.

*So ordered.*